**2021-1542**

# United States Court of Appeals for the Federal Circuit

SAS INSTITUTE INC.,

*Plaintiff-Appellant,*

– v. –

WORLD PROGRAMMING LIMITED,

*Defendant-Appellee.*

*On Appeal from the United States District Court
for the Eastern District of Texas
Case No. 2:18-cv-00295-JRG, Hon. J. Rodney Gilstrap, Chief Judge*

## BRIEF FOR PLAINTIFF-APPELLANT

DALE M. CENDALI
JOSHUA L. SIMMONS
ARI E. LIPSITZ
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
ari.lipsitz@kirkland.com

PRESSLY M. MILLEN
RAYMOND BENNETT
WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601
(919) 755-2100
ray.bennett@wbd-us.com
press.millen@wbd-us.com

MAY 14, 2021                    *Counsel for Plaintiff-Appellant*

# CERTIFICATE OF INTEREST

Counsel for Appellant-Plaintiff SAS Institute Inc. ("SAS") certify the following:

1.  We represent SAS.

2.  SAS is the name of the real party in interest.

3.  SAS does not have a parent corporation and is not a publicly held corporation.

4.  The following law firms and attorneys appeared for SAS in the Eastern District of Texas and have not entered an appearance in this appeal:

WOMBLE BOND DICKINSON (US) LLP

Christian E. Mammen
Carrie Richey
Samuel B. Hartzell

SIEBMAN, FORREST, BURG & SMITH, LLP

Michael C. Smith

MCGUIREWOODS LLP

Jason W. Cook
Shaun W. Hassett
Brad R. Newberg
Brian C. Riopelle
Rachelle H. Thompson (no longer with firm)

JONES DAY

Leozino Agozzino (no longer with firm)
Keith B. Davis
Hilda C. Galvan

5.    We are not aware of a case pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in this appeal.

6.    This is neither a criminal nor bankruptcy case.

Date: May 14, 2021

/s/ Dale M. Cendali
Dale M. Cendali

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ...........................................................................I

STATEMENT OF RELATED CASES ............................................................. XI

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT ..................................................................8

STATEMENT OF THE ISSUES........................................................................8

STATEMENT OF THE CASE...........................................................................9

      A.     SAS Created a Revolutionary Statistical Analysis Program: The SAS System..................................................................9

            1.     The Input Formats Are Complex and Original to SAS ............12

            2.     The Output Designs Reflect SAS's Decision-Making .............16

            3.     The SAS System Has Evolved Over Time ...............................19

      B.     There Are Other Ways of Creating Data Analysis Software ..............21

      C.     Instead of Innovating, WPL Created a Clone of the SAS System......24

      D.     The Parties' Prior Litigations .................................................28

      E.     The District Court Conducted a Novel Copyrightability Hearing......31

SUMMARY OF THE ARGUMENT ..................................................................33

ARGUMENT ..................................................................................................35

I.     STANDARD OF REVIEW..................................................................35

II.     THE DISTRICT COURT'S FILTRATION ANALYSIS WAS FUNDAMENTALLY FLAWED..................................................................36

      A.     The District Court Misapplied the Burdens of Identifying Protectable and Unprotectable Elements .............................................38

      B.     The District Court Also Misapplied the Federal Rules.......................43

C.      The Undisputed Facts Show that the SAS Material that WPL Copied Is Protectable As A Matter of Law ..........................................47

III.    THE DISTRICT COURT EXCLUDED SAS'S WITNESSES' TESTIMONY BASED ON ITS LEGAL ERROR.......................................59

A.      Excluding Dr. Storer Was Improper For the Same Reasons As Its Dismissal of SAS's Copyright Claim ..............................................60

B.      The District Court Improperly Refused to Let Mr. Collins Testify Within His Personal Knowledge..............................................64

CONCLUSION ...............................................................................................67

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alta Wind I Owner Lessor C v. U.S.*,
   897 F.3d 1365 (Fed. Cir. 2018) ............................................................63

*Apple Inc. v. Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014) ...........................................59, 62, 63

*Aspen Tech., Inc. v. M3 Tech., Inc.*,
   569 F. App'x 259 (5th Cir. 2014) ...................................................43, 44

*Atari Games Corp. v. Nintendo of Am., Inc.*,
   897 F.2d 1572 (Fed. Cir. 1990) ............................................................35

*Atari Games Corp. v. Nintendo of Am. Inc.*,
   975 F.2d 832 (Fed. Cir. 1992) .........................................................49, 58

*Atari Games Corp. v. Oman*,
   979 F.2d 242 (D.C. Cir. 1992) .............................................................48

*Bateman v. Mnemonics, Inc.*,
   79 F.3d 1532 (11th Cir. 1996) .........................................................40, 41

*Boisson v. Banian, Ltd*,
   273 F.3d 262 (2d Cir. 2001) ............................................................40, 41

*Braun Corp. v. Maxon Lift Corp.*,
   282 F. Supp. 2d 931 (N.D. Ind. 2003) .................................................67

*Brocade Commc'ns Sys. Inc. v. A10 Networks Inc.*,
   No. 5:10-cv-03428, 2011 WL 7563043 (N.D. Cal. Aug. 16, 2011) ..................40

*Broderbund Software, Inc. v. Unison World, Inc.*,
   648 F. Supp. 1127 (N.D. Cal. 1986) .....................................................52

*Caparotta v. Entergy Corp.*,
   168 F.3d 754 (5th Cir. 1999) ................................................................36

*CDN Inc. v. Kapes*,
   197 F.3d 1256 (9th Cir. 1999) ..............................................................37

v

*Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*,
951 F.3d 248 (5th Cir. 2020) ..............................................................67

*Compaq Comput. Corp. v. Procom Tech., Inc.*,
908 F. Supp. 1409 (S.D. Tex. 1995)...................................................49

*Compulife Software Inc. v. Newman*,
959 F.3d 1288 (11th Cir. 2020) .................................................*passim*

*Control Data Sys., Inc. v. Infoware, Inc.*,
903 F. Supp. 1316 (D. Minn. 1995).............................................52, 55

*E.E.O.C. v. Gen. Dynamics Corp.*,
999 F.2d 113 (5th Cir. 1993) ..............................................................64

*Eng'g Dynamics, Inc. v. Structural Software, Inc.*,
26 F.3d 1335 (5th Cir. 1994) .....................................................*passim*

*Eng'g Dynamics, Inc. v. Structural Software, Inc.*,
46 F.3d 408 (5th Cir. 1995) ................................................................48

*Engenium Sols., Inc. v. Symphonic Techs., Inc.*,
924 F. Supp. 2d 757 (S.D. Tex. 2013)....................................40, 44, 54

*Ets-Hokin v. Skyy Spirits, Inc.*,
225 F.3d 1068 (9th Cir. 2000) ...........................................................36

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)..................................................................*passim*

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*,
No. 03-cv-1431, 2006 WL 1330002 (N.D. Cal. May 15, 2006) .......66

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*,
9 F.3d 823 (10th Cir. 1993) .......................................................*passim*

*Gen. Universal Sys., Inc. v. Lee*,
379 F.3d 131 (5th Cir. 2004) ......................................38, 39, 40, 44

*Google LLC v. Oracle Am., Inc.*,
141 S. Ct. 1183 (2021)..............................................................35, 37, 56

*Herzog v. Castle Rock Ent.*,
   193 F.3d 1241 (11th Cir. 1999) ...............................................................44

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
   572 U.S. 559 (2014)...............................................................................59

*Hutchins v. Zoll Med. Corp.*,
   492 F.3d 1377 (Fed. Cir. 2007) ...............................................................58

*Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*,
   886 F.2d 1173 (9th Cir. 1989) ...............................................................55

*Kepner-Tregoe, Inc. v. Leadership Software, Inc.*,
   12 F.3d 527 (5th Cir. 1994) ...........................................................56, 59

*Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc.*,
   945 F.2d 509 (2d Cir. 1991) ...............................................................37

*Kregos v. Associated Press*,
   937 F.2d 700 (2d Cir. 1991) ...............................................................37

*Lance v. Freddie Recs., Inc.*,
   986 F.2d 1419 (5th Cir. 1993) ...............................................................54

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   253 F. Supp. 2d 943 (E.D. Ky. 2003) ...............................................................53

*Lipton v. Nature Co.*,
   71 F.3d 464 (2d Cir. 1995) ...............................................................50

*MathWorks, Inc. v. COMSOL AB*,
   No. 6:06-cv-335 (E.D. Tex.)...............................................................60

*Meyer Intell. Props., Ltd. v. Bodum, Inc.*,
   690 F.3d 1354 (Fed. Cir. 2012) ...........................................................62, 66, 67

*MiTek Holdings, Inc. v. Arce Eng'g Co.*,
   89 F.3d 1548 (11th Cir. 1996) ...............................................................39

*Montgomery v. Noga*,
   168 F.3d 1282 (11th Cir. 1999) ...............................................................40

*Oracle Am., Inc. v. Google Inc.*,
   750 F.3d 1339 (Fed. Cir. 2014) ....................................................*passim*

*Oriental Art Printing, Inc. v. Goldstar Printing Corp.*,
   175 F. Supp. 2d 542 (S.D.N.Y. 2001) .............................................37

*Palmer v. Chamberlin*,
   191 F.2d 532 (5th Cir. 1951) ...........................................................47

*Paramount Pictures Corp. v. Axanar Prods., Inc.*,
   No. 2:15-CV-09938, 2017 WL 83506 (C.D. Cal. Jan. 3, 2017).........53

*Peel & Co. v. The Rug Mkt.*,
   238 F.3d 391 (5th Cir. 2001) ...........................................................44

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*,
   384 F.3d 546 (5th Cir. 2004) ...........................................................61

*Ransom v. M. Patel Enters., Inc.*,
   734 F.3d 377 (5th Cir. 2013) ...........................................................36

*Raytheon Co. v. Indigo Sys. Corp.*,
   688 F.3d 1311 (Fed. Cir. 2012) ...................................................36, 45

*S. Credentialing Support Servs., L.L.C. v. Hammond Surgical Hosp., L.L.C.*,
   946 F.3d 780 (5th Cir. 2020) ...........................................................50

*Salinger v. Random House, Inc.*,
   811 F.2d 90 (2d Cir. 1987) ...............................................................58

*SAS Ins. Inc. v. World Programming Ltd.*,
   64 F. Supp. 3d 755 (E.D.N.C. 2014) ................................................53

*SAS Inst. Inc. v. S&H Comput. Sys.*,
   605 F. Supp. 816 (M.D. Tenn. 1985)...........................................20, 21

*SAS Inst. Inc. v. World Programming Ltd.*,
   874 F.3d 370 (4th Cir. 2017) .....................................................*passim*

*SAS Inst. Inc. v. World Programming Ltd.*,
   952 F.3d 513 (4th Cir. 2020) .....................................................*passim*

viii

*SAS Inst. Inc. v. World Programming Ltd.*,
　No. 5:10-cv-25, Dkt. 753 (E.D.N.C. May 3, 2018)................................31

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
　81 F.2d 49 (2d Cir. 1936) (Hand, J.) ...................................................56

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
　689 F.3d 29 (1st Cir. 2012)..................................................................41

*Softel v. Dragon Med. & Scientific Comm'cns*,
　118 F.3d 955 (2d Cir. 1997) ................................................................49

*Sparaco v. Lawler, Matusky & Skelly Eng'rs LLP*,
　303 F.3d 460 (2d Cir. 2002) ................................................................57

*Steyr Arms, Inc. v. Beretta USA Corp.*,
　No. 2:15-cv-01718, 2020 WL 2767359 (N.D. Ala. May 28, 2020)...................66

*Synopsys, Inc. v. Atoptech, Inc.*,
　No. 13-cv-2965, 2016 WL 80549 (N.D. Cal. Jan. 7, 2016) ...............60

*Syrus v. Bennett*,
　455 F. App'x 806 (10th Cir. 2011) .......................................................58

*Texas A&M Rsch. Found. v. Magna Transp., Inc.*,
　338 F.3d 394 (5th Cir. 2003) ..........................................................60, 64

*U.S. v. Land*,
　No. 13-cv-4721, 2014 WL 906230 (E.D. La. Mar. 7, 2014)..............64

*U.S. v. Riddle*,
　103 F.3d 423 (5th Cir. 1997) ...............................................................65

*U.S. v. Valencia*,
　600 F.3d 389 (5th Cir. 2010) (per curiam) ..........................................65

*Union Pac. Res. Co. v. Chesapeake Energy Corp.*,
　236 F.3d 684 (Fed. Cir. 2001) .............................................................65

*Vita-Mix Corp. v. Basic Holding, Inc.*,
　581 F.3d 1317 (Fed. Cir. 2009) ...........................................................62

*Warner Bros. Ent. v. X One X Prods.*,
   644 F.3d 584 (8th Cir. 2011) ...................................................................51

**Statutes**

17 U.S.C. § 101 ......................................................................................37, 53

17 U.S.C. § 102(a) .........................................................................................37

17 U.S.C. § 103(b) .........................................................................................51

17 U.S.C. § 410(c) ......................................................................................2, 40

28 U.S.C. § 1295(a)(1) ....................................................................................8

28 U.S.C. § 1331 ..............................................................................................8

28 U.S.C. § 1338 ..............................................................................................8

Copyright Act ..........................................................................................51, 57

North Carolina Unfair and Deceptive Trade Practices Act ...............29, 30

**Rules**

Fed. R. App. P. 4 ..............................................................................................8

Fed. R. Civ. P. 52 ...................................................................................*passim*

Fed. R. Civ. P. 56 .................................................................................4, 34, 45

**Other Authorities**

1 NIMMER ON COPYRIGHT § 2.01[B] .............................................................58

4 NIMMER ON COPYRIGHT § 13.03 ...................................................41, 55, 60

Ronald L. Johnston & Allen R. Grogan, *Copyright Protection for
   Command Driven Interfaces*, 12 COMPUTER L. INST. 1 (1991) ........................53

## **STATEMENT OF RELATED CASES**

We are not aware of a case in or from this same civil action or proceeding in the lower court or body that was previously before this or any other appellate court, nor are we are aware of a case pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in this appeal.

## **<u>INTRODUCTION</u>**

WPL admittedly copied numerous creative elements from SAS's computer program, the SAS System. As the Fourth Circuit determined in a prior litigation between the parties, to do so, WPL "acquired several copies of the SAS Learning Edition" by agreeing to SAS's license terms and then immediately proceeded to violate them, thereby committing breach of contract, fraudulent inducement, and unfair competition. *SAS Inst. Inc. v. World Programming Ltd.*, 874 F.3d 370, 376, 382-83 (4th Cir. 2017) (hereinafter, "*SAS I*"). As the district court acknowledged, WPL did so to create a "'clone' [of] the SAS Software," Appx9, that would replace it in the marketplace, using elements of SAS's own program. This "short cut" is not the "sort of 'innovation' or 'competition' encouraged by U.S. law." *SAS Inst. Inc. v. World Programming Ltd.*, 952 F.3d 513, 531 (4th Cir. 2020) (hereinafter, "*SAS II*").

Ordinarily, such brazen copying would constitute copyright infringement as a matter of law, or at least an issue for the jury to decide. Yet, here, the district court dismissed SAS's entire copyright claim prior to trial after a novel "copyrightability hearing." In so doing, the district court misapplied fundamental principles of copyright law and civil procedure. Reversal is, thus, proper for four principal reasons.

*First*, the court misapplied the burden-shifting framework for filtering out unprotectable elements of the SAS System. There is no dispute that SAS owns the copyrights to the SAS System or that it is creative and original to SAS. Nor is there a dispute that WPL's clone (the World Programming System or "WPS") copied two critical parts of the program: (a) the complex sets of statements designed by SAS, using keywords selected and arranged by SAS, that are used by the SAS System to carry out statistical analysis, along with their organization (the "Input Formats"); and (b) the particular expression by which the SAS System displays its data analysis (the "Output Designs") (together, the "SAS Material").

Under well-settled copyright principles, once SAS established that it owned a valid copyright and that WPL copied SAS Material, it became WPL's burden to come forward with evidence showing that ***what it copied*** was not protectable under limiting doctrines such as merger, *scènes à faire*, or the public domain. This is particularly true because, pursuant to 17 U.S.C. § 410(c) by repeatedly registering the SAS System with the Copyright Office over the past 40 years, SAS was entitled to a presumption of validity and originality that it was WPL's burden to overcome. This, as well as the weight of judicial authority, demonstrates that "the ***defendant*** bears the burden of proving—as part of the filtration analysis—that the elements he copied from a copyrighted work are ***unprotectable***." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1305 (11th Cir. 2020).

Despite acknowledging this burden-shifting framework, Appx13-15, the district court failed to apply it. WPL made no effort to show that everything it copied was unprotectable, instead pointing to parts of the SAS System it did not copy or, at best, a fragment of the SAS Material it did. Thus, the court could not and did not find that *all* of the SAS Material that WPL copied was unprotectable. Even for the material WPL did identify, the court's opinion did not analyze the limiting doctrines. Instead, in a single paragraph, the opinion merely parroted the names of certain limiting doctrines that WPL incorrectly claimed made parts of the SAS System unprotectable, without regard to whether they were part of the copied SAS Material or not. Appx16.

The district court, however, should have treated as protectable everything that WPL did not show was unprotectable. *Compulife*, 959 F.3d at 1306 ("[W]here the defendant's evidence is insufficient to prove that a particular element is unprotectable," courts "simply assume that the element is protectable and include that element in the final substantial-similarity comparison between the works."). The court did the opposite: it required SAS to *disprove* application of the limiting doctrines. Appx17 (SAS "has not shown the existence and extent of any remaining protectable work"). *That was not SAS's burden*. Thus, the court erred by failing to treat the SAS Material as protectable and *sua sponte* dismissing SAS's entire claim on the basis that the SAS Material had "not been shown to be copyrightable"

3

by SAS.  Appx18.  The district court's approach was wrong, and had the practical effect of forcing SAS to prove a negative.

*Second*, the district court also misapplied the Federal Rules of Civil Procedure when it dismissed SAS's claim.  Prior to its novel copyrightability hearing, the district court denied the parties' cross-motions for summary judgment, acknowledging that genuine issues of material fact precluded such a ruling as to protectability.  Appx1.  This should have resulted in protectability going to the jury.  Instead, the court jumped to the idea that it could decide filtration outside the summary judgment posture, held the copyrightability hearing, and issued an opinion dismissing SAS's copyright claim without specifying its procedural basis for doing so.  Its decision was improper:

- If the district court, having misinterpreted the burden-shifting framework and ignored the presumption of validity afforded by SAS's copyright registrations, intended to grant WPL summary judgment *sua sponte* under Rule 56, it needed to find that there were no genuine issues of disputed fact.  Consistent with its prehearing conclusion that such issues existed, it did not do so.  Nor could it as, on summary judgment, the district court was required to view the evidence in the light most favorable to SAS, drawing all reasonable inferences in

4

SAS's favor, as to what was *scènes à faire*, whether SAS's choices were somehow constrained, etc.

- If, instead, the court intended to decide filtration under Federal Rule 52—despite both parties having prepared for a jury trial—it erred because it was required to make findings of fact with regard to the application of the limiting doctrines to the material WPL copied. Yet, none of its factual findings relate to the limiting doctrines, and its conclusions of law do not apply them.

In either case, by premising its procedural approach on a misunderstanding of the burden-shifting framework, the district court's decision was doubly wrong.

*Third*, the decision's filtration conclusion ultimately is wrong on the merits. The Supreme Court explained in *Feist Publications, Inc. v. Rural Telephone Service Co.* that creative choice is the hallmark of whether elements of a work are protectable. 499 U.S. 340, 348 (1991) (choices as to selection, ordering, and arrangement are protectable). Here, the record shows that the copied SAS Material is protectable as a matter of law. There is no debate that SAS had many options available to it when it created the SAS Material, including selecting what Input Formats and Outputs Designs to create, how to organize and arrange the keywords and other material within them, and which groupings to place them in. Nor is there evidence that SAS's choices were constrained. Indeed, SAS presented evidence of

other competitors that created their own equivalents to the SAS Material that are dissimilar to SAS's approach. For these reasons alone, the SAS Material is protectable. Moreover, WPL missed its chance to show that all of the SAS Material it copied was unprotectable. As discussed below, WPL cannot carry its burden under the hodge-podge of limiting doctrines that it raised given the evidence that already is before the district court.

*Fourth*, as an extension of its misapplication of the burdens inherent to copyright law and civil procedure, the district court abused its discretion at the copyrightability hearing by excluding SAS's primary technical expert and fact witness, based on an erroneous view of the law. In excluding SAS's technical expert, Dr. James Storer, the court relied on its fundamental legal misconception that it was SAS's burden to prove that the elements WPL copied from SAS's oft-registered SAS System were protectable, as opposed to WPL's burden to prove that they were not. It wanted Dr. Storer to explain how the limiting doctrines did not apply to each piece of SAS Material that WPL copied. Yet, as discussed above, that was not Dr. Storer's role, nor was it required due to WPL's lack of relevant evidence, which would have required Dr. Storer to boil the ocean to prove protectability. As the *CompuLife* court noted, "some types of unprotectability can be negated only by presenting practically infinite evidence." 959 F.3d at 1305 ("Placing the burden of proving protectability on the plaintiff would seemingly

6

require just these kinds of impossibilities."). Under the court's incorrect burden-shifting analysis, Dr. Storer had no way to execute the court's impossible task.

Compounding this series of errors, the district court improperly limited the testimony of SAS's primary *fact* witness, Mr. Keith Collins, incorrectly reasoning that, because he was SAS's recently-retired Chief Technical Officer and head of research and development for 20 years, his considerable personal knowledge amounted to expert testimony when he tried to explain how the SAS System worked. Although the court acknowledged that Mr. Collins was identified to testify about the "history and operations of SAS, including company research and development of the SAS System, SAS System input formats and output designs, and registration of copyrights," Appx4 n.2, as discussed below, it repeatedly prohibited Mr. Collins from doing so. These errors were hardly harmless. As a result, this Court should reverse the district court's exclusion of SAS's witnesses.

The bottom line is that WPL wanted to compete with the SAS System, but did not want to innovate. Instead, it created a knockoff to steal SAS's ingenuity and customers. Accordingly, SAS requests that this Court reverse the district court's improper burden shifting and exclusion of evidence, find that WPL copied protectable elements of the SAS System, and remand for a trial where the SAS Material and WPS will be compared by the jury.

**JURISDICTIONAL STATEMENT**

As a copyright case, the district court had jurisdiction under 28 U.S.C. §§ 1331, 1338.  This Court has jurisdiction because the complaint included patent claims, 28 U.S.C. § 1295(a)(1), the court entered final judgment on December 10, 2020, Appx25, and SAS timely appealed.  Appx3572; Fed. R. App. P. 4(a)(1)(A).

**STATEMENT OF THE ISSUES**

1.    Where SAS holds multiple copyright registrations affording it a statutory presumption of validity, and where it is well-settled that a defendant contesting the protectability of copied material must present evidence that such material was unprotectable, did the district court err in finding that WPL satisfied its burden despite failing to present evidence that all of the SAS Material it copied was unprotectable?

2.    In light of the district court's previous conclusion that genuine issues of material fact precluded a summary judgment finding, was the district court's "copyrightability" determination substantively and procedurally flawed as (a) if it was a summary judgment decision, it did not find that no such issues existed viewing the facts in SAS's favor; or (b) if it were a Rule 52 decision, there were no factual findings or legal conclusions that everything WPL copied was unprotectable?

3.      Given that the SAS Material is creative, and it is undisputed that SAS had an unlimited number of options in creating it, including selecting the elements to include and their arrangement within and among the Input Formats and Output Designs, and given that SAS's registrations afforded the SAS Material a presumption of validity, was the SAS Material WPL copied protectable?

4.      Did the district court err in excluding SAS's fact and expert witnesses' testimony based on a legally erroneous view of the burden-shifting framework?

**STATEMENT OF THE CASE**

**A.      SAS Created a Revolutionary Statistical Analysis Program: The SAS System**

SAS "offers customers an integrated range of software products known as the 'SAS System' which enables users to perform a variety of tasks related to data access, data management, data analysis (including statistical analysis), and data presentation." Appx7 (internal quotation marks omitted). As explained by Mr. Collins, the SAS System required "millions of man-hours of creative and difficult development and programming work on the part of thousands of SAS statisticians and programmers over the course of many years." Appx311 ¶4; *see also* Appx3353:17-20 (SAS System is "a very large and complex computer program that addresses the primary market spaces of data management, analytics, and business intelligence."). "Since its formation in 1976, SAS has sought to

9

improve its products, investing a sizable percentage of revenue into research and development." *SAS II*, 952 F.3d at 531.  Indeed, SAS's R&D team has about 2,700 people, including hundreds of Ph.D.s, Appx3350:24-3351:2, Appx3351:9-11, and it annually invests over $700 million into R&D.  Appx3351:12-20.

Within the SAS System, SAS Procedures "enable data analysis functionality through mathematical and statistical algorithms, calculations, variables, and measurements."  Appx8.  They "perform various analyses on data."  *Id*.  For example, one Procedure is PROC MIXED, which "fits different mixed linear models to data and enables users to make statistical inferences about the data."  Appx683 ¶15.

Unlike other kinds of software that involve moving a cursor around a graphical display, the SAS System has textual inputs.  Thus, for example, to use the PROC MIXED Procedure to "perform a two-way analysis of variance" of certain data reflecting the heights and genders of members of a family, a user might input the following text into the SAS System:

```
proc mixed data=heights;
    class Family Gender;
    model Height = Gender Family Family*Gender;
run;
```

Appx8470.  As discussed below, the keywords that the text uses, their order, and various other parts of the user's input text are determined by the Input Format for SAS's PROC MIXED Procedure.  *Infra* 12.

When the Input Format is used, the SAS System "runs so as to give the user the desired data analysis."  Appx8; *see also* Appx3355:1-9.  To do this, it uses "prewritten, specialized software."  Appx312 ¶9.  Given data and the textual input above, the PROC MIXED Procedure will operate, and the SAS System will create a report, like the following:

```
                        The Mixed Procedure

                        Model Information

        Data Set                       WORK.HEIGHTS
        Dependent Variable             Height
        Covariance Structure           Diagonal
        Estimation Method              REML
        Residual Variance Method       Profile
        Fixed Effects SE Method        Model-Based
        Degrees of Freedom Method      Residual



                  Class Level Information

        Class      Levels     Values

        Family        4      1 2 3 4
        Gender        2      F M



                        Dimensions

          Covariance Parameters          1
          Columns in X                   15
          Columns in Z                   0
          Subjects                       1
          Max Obs Per Subject            18
```

11

```
                    Number of Observations

        Number of Observations Read              18
        Number of Observations Used              18
        Number of Observations Not Used           0




                      Covariance Parameter
                           Estimates

                   Cov Parm       Estimate

                   Residual        2.1000




                        Fit Statistics

            -2 Res Log Likelihood         41.6
            AIC (smaller is better)       43.6
            AICC (smaller is better)      44.1
            BIC (smaller is better)       43.9




                  Type 3 Tests of Fixed Effects

                        Num      Den
        Effect           DF       DF     F Value     Pr > F

        Gender            1       10      17.63      0.0018
        Family            3       10       5.90      0.0139
        Family*Gender     3       10       2.89      0.0889
```

Appx8471-8472.  This is one of SAS's Output Designs.  *Infra* 16.

This case involves WPL's copying of the SAS System's Input Formats and Output Designs to create its clone: WPS.

### 1.    The Input Formats Are Complex and Original to SAS

SAS's engineers designed the Input Formats as part of the SAS Procedures. Appx3355:19-25.  They are a "collection of PROCs, statement, options, formats,

12

informats, global statements, access engines and other elements available to the user and the syntax." Appx9. Each Procedure's Input Format begins with the keyword "PROC," Appx3355:1-5, and then has a specific "hierarchy and a form that goes statement, option," and so forth. Appx3360:1-5.

For example, as shown below using an image from one of SAS's user manuals, PROC MIXED's Input Format is highly complex. Appx689-690 ¶29. Each line involves different "Statements," some of which also have "Options" that "control … different capabilit[ies] of the procedure." Appx1350:8-10. For example, the combination of the SAS-selected keywords "PROC" and "MIXED" is a Statement that causes the SAS System to run the PROC MIXED Procedure. Appx8476. The top-level PROC MIXED Statement, in turn, has the Options "DATA" (an "input data set") and "METHOD" (an "estimation method"), among others. *Id.* The Input Format also has lower-level Statements, such as CLASS (which controls the data as variables) and MODEL (which specifies "dependent variable and fixed effects"), which may or may not have their own Options. Appx8476-8477. Its hierarchy alone has 18 Statements with over 170 Options and even more structures and combinations under them, requiring 200 pages in SAS's manual to describe. Appx8465-8665. It is this creative combination of keywords in the particular SAS-selected order that allows the input text above to generate the indicated tables. *Supra* 9; *see also* Appx8476-8478.

13

```
PROC MIXED < options > ;
    BY variables ;
    CLASS variable < (REF= option) > ...< variable < (REF= option) > > </ global-option
    CODE < options > ;
    ID variables ;
    MODEL dependent = < fixed-effects > </ options > ;
    RANDOM random-effects </ options > ;
    REPEATED < repeated-effect > </ options > ;
    PARMS (value-list) ... </ options > ;
    PRIOR < distribution > </ options > ;
    CONTRAST 'label' < fixed-effect values ... >
             < | random-effect values ... >,...</ options > ;
    ESTIMATE 'label' < fixed-effect values ... >
             < | random-effect values ... > </ options > ;
    LSMEANS fixed-effects </ options > ;
    LSMESTIMATE model-effect lsmestimate-specification </ options > ;
    SLICE model-effect </ options > ;
    STORE < OUT= >item-store-name </ LABEL= 'label' > ;
    WEIGHT variable ;
```

Appx8476.

Each Procedure "is separately written and has its own design including its own syntax, options, statements, and defaults." Appx8. Over the years, SAS has created over 500 Procedures with their own Input Formats. Appx3355:10-12; Appx312 ¶9 (other Input Formats).

The Procedures and their accompanying Input Formats are then organized into different groupings. PROC MIXED and 78 other Procedures are part of SAS/STAT, which is described in a 9,000 page manual. Appx3365:9-12, 21-23; Appx3575-3579 (SAS/STAT user guide). Other groupings include Base SAS, SAS/Graph, SAS/ETS, SAS/ACCESS, and others. Appx315 ¶17.

"SAS alone determines, among other things, what statements are created, how they function, what options they have (and which are excluded), and how they are made consistent with one another." Appx311-312 ¶6. Because of the Input

14

Formats' technical complexity, SAS's "developers work to define a simple set of concise commands to request a comprehensive analysis." Appx312 ¶8. They "need to decide how to express the different input, how to structure the input formats, and ultimately how the [SAS Material] will relate to each other." *Id.*; Appx1353 at 34:21-23 ("When a procedure writer writes a procedure and chooses the set of capabilities that's designed for execution in a specific analysis that we provide."). The developers have a "large number of choices among the various elements of a given" Input Format. Appx322 ¶17. As explained by SAS's former Distinguished Software Developer, Alan Eaton, those choices include:

- "What is the intended user-audience";

- "Are the intended users primarily working in the academic, industry, or government sector";

- "What is the anticipated training, educational, and experience background of the intended users";

- "Should the statement and option names be an abbreviation or full length";

- "Should the statement and option names have underscores, dashes or other punctuation";

- "Is the statement or option expressive of the underlying idea";

- "Is the statement or option intuitive";

15

- "Is the statement or option easy to remember";

- "Is the statement or option user-friendly";

- "What kind of syntax should be used";

- "Should the syntax include commas, colons, semicolons, periods, back-slashes, forward slashes, or a mixture of different syntax";

- "Should the syntax involve default values";

- "What default values should be chosen"; and

- "How do the statements, options, syntax, command structure, default values, and other elements interrelate to each other to provide a user-friendly and expressive input format."

Appx322-323; *see also* Appx727-729 (additional considerations).

### 2. The Output Designs Reflect SAS's Decision-Making

For each Procedure, SAS also created Output Designs, which are "what the user actually sees." Appx313 ¶11. They reflect SAS's myriad choices such as "tables, graphs, and other forms of output on the screen," including "plots, colors, texts, and fonts." Appx8-9. For example, a SAS user manual explains that when the PROC MIXED Procedure is used as shown below (left), the SAS System will return the output below (right):

| Input | Output |
|---|---|

```
proc mixed data=heights;
    class Family Gender;
    model Height = Gender Family Family*Gender;
run;
```

```
                    The Mixed Procedure

                     Model Information

Data Set                         WORK.HEIGHTS
Dependent Variable               Height
Covariance Structure             Diagonal
Estimation Method                REML
Residual Variance Method         Profile
Fixed Effects SE Method          Model-Based
Degrees of Freedom Method        Residual


                Class Level Information

    Class      Levels    Values

    Family        4      1 2 3 4
    Gender        2      F M


                      Dimensions

         Covariance Parameters        1
         Columns in X                15
         Columns in Z                 0
         Subjects                     1
         Max Obs Per Subject         18


               Number of Observations

        Number of Observations Read        18
        Number of Observations Used        18
        Number of Observations Not Used     0


              Covariance Parameter
                    Estimates

         Cov Parm       Estimate

         Residual        2.1000


                   Fit Statistics

        -2 Res Log Likelihood          41.6
        AIC (smaller is better)        43.6
        AICC (smaller is better)       44.1
        BIC (smaller is better)        43.9


            Type 3 Tests of Fixed Effects

                    Num      Den
    Effect           DF       DF    F Value    Pr > F

    Gender            1       10     17.63     0.0018
    Family            3       10      5.90     0.0139
    Family*Gender     3       10      2.89     0.0889
```

Appx8470-8472.  Not all of the Output Designs are textual.  Appx8612 (graphical output).

SAS's Output Designs have certain default content and formatting that will appear unless different SAS-created settings are selected.  Appx9.  Shown below (left) is an example of an Output Design copied by WPL (right): the SAS-default report for the PROC MIXED Procedure described above.  Appx689-690 ¶29.

17



Like the Input Formats, Output Designs are created by SAS developers to "make sure that output is clear, consistent, and intuitive for those in the industries that use it."  Appx313 ¶11; Appx732-734 ("[O]n the one hand we don't want to overwhelm [users] with a lot of output that they can't digest; on the other hand, what we want to do is give them a set of results that they can really use across a wide number of problems." (former SAS Senior Director of Statistical Software Development describing output creation process)).  For example, developers "spent thousands of hours working through the abstractions to enable this approach to work by considering output design details such as placement of columns, number of decimal places, number alignment, color and font, and many other details."  Appx313 ¶11.  Mr. Eaton explained some of the choices involved with creating the Output Designs:

18

- "How to structure and organize the output in a manner that is helpful and aesthetically pleasing to a user";

- "How to label and annotate output"; and

- "How to create an overall visually appealing display and organization of data from which the user can identify the desired information."

Appx324 ¶26.

The parties' experts agree that there was no limit on the design of the Output Designs. SAS's expert, Dr. Storer, explained that data analysis reports can "present the same information many different ways." Appx3399:14-3400:9 ("The same numbers could … be presented in many different ways …"). Similarly, WPL's expert, Dr. Mark Jones, testified that there are an "infinite number of possibilities for generating graphics." Appx3522:9-11.

### 3.    The SAS System Has Evolved Over Time

During the 45 years of developing the SAS System, it was updated continuously and regularly registered with the Copyright Office. Appx315 ¶17. As Mr. Collins explained, SAS consistently "released new versions of its software" in which "new elements were added to those already present in earlier versions and many elements were expanded in those new versions." Appx314-315 ¶16; Appx3360:22-3361:11. For example, the PROC MIXED Procedure described above was added in the 1990s. Appx3366:10-12. Likewise, "[o]ccasionally, older

19

elements were deprecated, and, in rare cases, elements were removed (typically replaced by a new element)." Appx314-315 ¶16. The process of updating the SAS System, just like "the decisions made in connection with issuing a new version of SAS—whether to add new elements, expand elements already present, or deprecate or remove old elements—were part of a creative process of selecting those elements which SAS believed would be most attractive to its customers, the users of the SAS System software." *Id*.

Although a version of the program from 1976 is in the public domain, Appx8, that version contained only 33 Procedures and did not constitute the bulk of later, protectable versions. Appx3517:25-3518:4. By 1981, SAS released SAS 79.5. In an unrelated copyright lawsuit that SAS brought against a different defendant, a district court considered the protectability of SAS 79.5 and concluded that it represented "overwhelmingly a new and original work of authorship, above and beyond the pre-existing work contained in earlier release of SAS." *SAS Inst. Inc. v. S&H Comput. Sys.*, 605 F. Supp. 816, 827 (M.D. Tenn. 1985). Thus, that court concluded that "the copyright in SAS 79.5 is valid and fully enforceable." *Id.*; *see also* Appx3515:24-3516:18 (SAS 79.5 required "five years and more than 18 man-years of labor" resulting in "the addition of new procedures and major enhancements to existing procedures in SAS").

20

In the subsequent forty years, even SAS Material that existed in the 1976 version of the SAS System was substantially re-written.  For example, the bulk of PROC UNIVARIATE's outputs were redone "in more recent years."  Appx729.  Likewise, PROC MATRIX "was removed from the SAS System and ultimately replaced by … PROC IML."  *Id.*

SAS 79.5 was registered with the Copyright Office, Appx315 ¶17, and SAS has continued to register major releases of the SAS System up to the present day.  Appx315-316 ¶19-20.  The SAS System is covered by seven copyright registrations.  Appx345-371 (registration certificates).

### B.     There Are Other Ways of Creating Data Analysis Software

SAS's approach to creating data analytics software reflects its own creative choices.  Other competitors made other choices, showing that SAS's approach is not the only one as the competitors have their own approaches that do not require the use of the expression embodied in the SAS Material.  For example, shown below are three ways of invoking a regression analysis.  On the left is how the SAS System causes its regression analysis to occur using SAS's Input Format for PROC REG.  On the top right is SPSS, "a competing statistical analysis software," and on the bottom right is R, an "open-source statistical analysis software."  Appx685-686 ¶22.  As is clear below, each uses different expression to achieve the same result.

21

| SAS System | SPSS |
|---|---|
| ```
ods select ParameterEstimates;
proc reg data=baseball;
    id name team
    league;


model logSalary = no_hits no_runs no_rbi no_bb yr_major cr_hits;
run;
``` | Regression<br>  /dependent logSalary<br>  /method=enter no_hits no_runs no_rbi no_bb yr_major cr_hits. |
| | **R** |
| | reg_results<-lm(logSalary~no_hits+no_runs+no_rbi+no_bb+yr_major+cr_hits) |

Likewise, Dr. Storer identified numerous alternative ways to express the same outputs. For example, shown below is SAS's Output Format for the PROC UNIVARIATE Procedure, which differs markedly from the approach taken by SPSS and R. Appx687-688 ¶¶26-27; *see also* Appx818-864; Appx1140-1336.

22

# SAS System

```
The UNIVARIATE Procedure
        Variable:  Score

                    Moments

N                        30   Sum Weights                30
Mean              74.6333333   Sum Observations         2239
Std Deviation     12.5848385   Variance           158.378161
Skewness          -0.3495061   Kurtosis           0.10385765
Uncorrected SS        171697   Corrected SS       4592.96667
Coeff Variation   16.8622222   Std Error Mean     2.29766665


            Basic Statistical Measures

     Location                       Variability

Mean      74.63333    Std Deviation           12.58484
Median    74.50000    Variance               158.37816
Mode      73.00000    Range                   56.00000
                      Interquartile Range     17.00000

          Tests for Location: Mu0=0

    Test            -Statistic-      -----p Value------

    Student's t     t  32.48223    Pr > |t|     <.0001
    Sign            M        15    Pr >= |M|    <.0001
    Signed Rank     S     232.5    Pr >= |S|    <.0001


             Quantiles (Definition 5)

             Quantile      Estimate

             100% Max        100.0
             99%             100.0
             95%              92.0
             90%              90.0
             75% Q3           84.0
             50% Median       74.5
             25% Q1           67.0
             10%              56.0
             5%               54.0
             1%               44.0
             0% Min           44.0

              Extreme Observations

        ----Lowest----        ----Highest---

        Value     Obs         Value     Obs

          44       6            87       21
          54      24            90        5
          56      20            90       13
          56       1            92        9
          64      28           100       23
```

23



**C.    Instead of Innovating, WPL Created a Clone of the SAS System**

WPL competes with SAS "in the market for statistical analysis software."

*SAS II*, 952 F.3d at 518.  Instead of creating its own program, WPL decided to "do

what SAS does."  Appx440.  "WPL acquired copies of SAS software," *SAS II*, 952

F.3d at 518, and fraudulently and in violation of the terms of SAS's license

agreement, *SAS I*, 874 F.3d at 376, 380-83, used that software to create a "clone"

of the SAS System: WPS.  Appx9; Appx443 (WPL's "focus" was to be "a follow

24

my leader SAS cloner"). "WPS's commercial purpose is to compete with and replace SAS Institute products." Appx704.

With regard to the Input Formats, it is undisputed that WPS "emulates the SAS System" by using them. Appx10. When Dr. Storer compared the SAS System and WPS, he found that the "overwhelming majority of WPS elements are identical to those in the SAS System." Appx737-738. For example, using the PROC MIXED example discussed above, Dr. Storer showed that WPL copied each statement and option. Appx808-815. Moreover, as further versions of WPS were released, "the total number of WPS elements identical to those in the SAS System has increased." Appx738; *see also* Appx1374-1428 (WPS "Quick Reference" describing WPL's sole product, emphasizing material copied from SAS (reflected with a Y)). Similarly, a WPL spreadsheet lists nearly 200 Input Formats that either had been copied or soon would be. Appx524-528; *see also* Appx537:1-20 (WPL's "roadmap" of product development was copying SAS).

With regard to the Output Designs, it is undisputed that WPS has displays that are "equivalent" to SAS's Output Designs with "similar graphical output." Appx10. For example, as shown below, when WPS produces a report using one of the copied Input Formats, it looks just like the SAS-default PROC MIXED Output Design. Appx689-690 ¶29.

25



Other comparisons of the parties' outputs include:





*See also* Appx865-1137 (additional examples of copied outputs).  WPS copied the

Output Designs because it sold WPS as a SAS System clone: as one WPL graphics

programmer testified, "All users of the SAS software expect WPS to give precisely

the same output as is produced by the SAS software in response to any given input.

Any deviation in the output from WPS as compared to that produced by the SAS

software is perceived by end users to be a WPS bug."  Appx544 ¶15; *see also*

Appx558 ¶52 ("any report layout also has to be the same").

WPL positioned the WPS product as a direct substitute for the SAS System:

"Whatever you do with SAS now we'll replace it."  Appx704.  It even publicly

advertised that it was creating an "equivalent to SAS data libraries"—they would

be "[i]dentical in fact as we write a SAS clone."  Appx446.  Then, having copied

the core elements of the SAS System, WPL touted its copying to perspective

27

customers, explaining "How was WPS Built to Emulate SAS." Appx476-477. As shown below in WPL's own trial demonstrative, as it took more and more customers from SAS, it copied more and more Procedures. Appx642.



In other words, WPL learned that its copying led to sales and to new customers. In addition to saving R&D costs, because WPL's copying was so extensive, it had its customers use SAS's manuals instead of WPL documentation. Appx518 (WPL "got by with expecting customers to have SAS documentation on hand to explain how to use a particular language feature").

### D.    The Parties' Prior Litigations

Faced with WPL's blatant copying of the SAS System and disregard for SAS's contract, in September 2009 and January 2010, "SAS filed lawsuits against WPL in the U.K. and in the Eastern District of North Carolina," respectively. *SAS I*, 874 F.3d at 376. In the U.K. litigation, SAS asserted copyright infringement and

breach of its license agreement. *Id.* The case proceeded through the U.K. and European courts. The "U.K. High Court determined that, to the extent WPS reproduced the SAS System, it reproduced only aspects of the program that are not protected by U.K. copyright law," and that "because WPL's behavior was explicitly protected by the [E.U. Software] Directive, SAS could not enforce any contractual provisions that prohibited it." *Id.* at 377. "The Court of Appeal of England and Wales affirmed the U.K. High Court's ruling, and it became final when the Supreme Court of the U.K. refused SAS's request to appeal the judgment further on July 9, 2014." *Id.*

In the North Carolina litigation, SAS asserted "copyright infringement and breach of the license agreement, but additionally asserted claims for fraudulent inducement, tortious interference with contract, tortious interference with prospective business advantage, and violation of the North Carolina Unfair and Deceptive Trade Practices Act (UDTPA)." *Id.* at 376. In that case, the "district court granted summary judgment to SAS on the question of liability for breach of the license agreement, but granted summary judgment to WPL on SAS's claims for copyright infringement of the SAS System, tortious interference with contract, and

29

tortious interference with prospective economic advantage."[1]  *Id.* at 377.  The North Carolina case "proceeded to trial on SAS's claims for fraudulent inducement and UDTPA violations, as well as for the calculation of damages from WPL's breach of contract."  *Id.*  The jury found "WPL liable for fraudulent inducement and UDPTA violations," and awarded SAS $79,129,905 in damages.  *Id.*

On appeal, in October 2017, the Fourth Circuit determined that the terms of SAS's license agreement were "unambiguous" and that "WPL violated those terms."  *Id.* at 375.  It also concluded that the U.K. judgment did not preclude the U.S. litigation because the "U.S. suit alleged violations of U.S. copyright" that could not have been litigated in U.K. courts, and "the U.S. suit focused only on sales of WPS within the United States," not U.K. sales.  *Id.* at 379.  Moreover, it found that the "United States has taken an approach that is more protective of intellectual property, and North Carolina courts have taken an approach that is more protective of the sanctity of contract."  *Id.*  As to the copyright claim, the "only relief" SAS sought "that it has not already received from its other claims [was] an injunction," and the court found that SAS was not entitled to an injunction as it already had been awarded $79 million in damages.  *Id.* at 386-87, 389.  As

---

[1]    With regard to copyright infringement, as discussed below, the court misinterpreted a witness's testimony as suggesting that no license was necessary to use the SAS language.  *Infra* 53.

SAS would not receive additional relief from the copyright claim, the court "vacate[d] the district court's ruling on the now-moot copyright issue, with the result that the claim should be dismissed on remand." *Id.* at 390. Shortly thereafter, on May 3, 2018, the district court dismissed the copyright claim without prejudice. *SAS Inst. Inc. v. World Programming Ltd.*, No. 5:10-cv-25, Dkt. 753 (E.D.N.C. May 3, 2018). Thus, the prior North Carolina copyright decision is of no precedential import.

After the appeal, SAS attempted to collect on the North Carolina judgment, but WPL resisted payment at every turn. This led to the district court enjoining WPL from licensing WPS to any new customer for use within the United States until WPL satisfied the judgment, which WPL appealed. The Fourth Circuit affirmed, noting that "WPL cannot participate in the U.S. market, violate U.S. law, and expect to avoid the consequences of its conduct." *SAS II,* 952 F.3d at 519-520, 531.

### E.    The District Court Conducted a Novel Copyrightability Hearing

SAS filed the instant lawsuit in July 2018, asserting copyright and patent claims seeking monetary relief that did not overlap with the North Carolina suit. Appx140-150. After discovery, both parties moved for summary judgment on SAS's copyright claim. The district court, however, decided to hold a "copyrightability hearing" with live witnesses so that it could "filter[] out ideas,

facts, information in the public domain, merger material, and *scènces à faire*," Appx4-12 (internal quotation marks omitted), and identify the "core protectable expression" at issue, which it believed would "facilitate an accurate 'comparison' as part of the infringement analysis by the jury." Appx2. As a result of that decision, the court denied the summary judgment motions as moot. *Id.*

The parties submitted briefing and other evidence in advance of the hearing. During the hearing, Mr. Collins and Dr. Storer testified on behalf of SAS. Appx3300-3301. The court barred Mr. Collins from testifying as to any specifics concerning the design of the SAS System, considering it expert testimony. Appx3356:9-3357:5. In keeping with WPL's burden to explain its basis for unprotectability, Dr. Storer then testified that he did not filter out SAS Material that was creative and not dictated by external considerations as shown by competitors' alternative and independent designs. Appx3403:17-22; Appx3406:6-13; *see supra* 21. The court, however, barred him from fully offering his filtration analysis. Appx3414:9-3415:3.

Subsequently, WPL's expert, Dr. Jones, testified that he did not attempt to filter out everything that WPL copied. Instead, he mentioned certain "species of unprotectable elements," but did not actually provide a list of which material should be filtered. Appx3488:10-11; Appx3513:11-3514:23 (admitting he did not "provide a list of all *scènes à faire* elements").

32

After the hearing, instead of identifying the protectable expression of the SAS System, the court concluded that it was SAS's burden to identify the protectable elements that WPL copied and that SAS had not met that burden. Appx17. Then, without explanation or permitting any additional submissions by the parties (despite previously stating that it would), Appx2, the district court noted that "the Court is of the opinion that the copyright claims of SAS in the above-captioned case have not been shown to be copyrightable, and therefore should be and hereby are DISMISSED WITH PREJUDICE." Appx18.

## SUMMARY OF THE ARGUMENT

I.     The district court's "copyrightability" decision should be reversed because it incorrectly applied the filtration analysis.

**A.** After a copyright owner shows that it owns a copyrighted work and the defendant engaged in copying, it is the defendant's burden, as part of the filtration analysis, to show that what it copied is unprotectable under one or more of the limiting doctrines. This is particularly true where, as here, the copied work was timely registered with the Copyright Office, leading to a presumption of validity. Yet, here, the district court reversed that burden: it merely required WPL to show that "some" of the SAS System is not protectable expression, and without regard to whether WPL copied that material from SAS. This alone requires reversal.

33

**B.** Filtration normally is addressed by the jury at trial or by the court on summary judgment. Yet, here, the district court determined it could not decide the issue on summary judgment, and then, without explaining under what Federal Rule it was proceeding, it dismissed SAS's copyright claim. Either the district court erred by failing to follow Rule 56 and find no genuine issues of material fact after drawing all inferences in SAS's favor, or it erred under Rule 52 by failing to make findings of fact or conclusions of law with regard to filtration. In either case, when the court determined it did not have sufficient facts to determine what the unprotectable elements that WPL copied were, it was required to treat the copied elements as protectable and allow the jury to compare the works.

**C.** The SAS Material is protectable as a matter of law for two, independent reasons. First, it reflects SAS's creative choices from an unlimited range of possibilities. Second, to the extent an Input Format or Output Design contained an unprotectable element, the overall selection and arrangement of elements is protectable. Faced with this, WPL was unable to show under any limiting doctrine that what it copied is unprotectable. Thus, this Court should find that the SAS Material is protectable and remand to the district court for the jury to compare the copied material to WPS.

**II.**    The district court erred by excluding SAS's witnesses' testimony.

34

**A.** Dr. Storer was excluded, not because he is unqualified (the court found he was), but because he did not conduct the filtration analysis using the district court's legally flawed approach. As that approach was wrong, it was error to exclude Dr. Storer. The error was magnified by the court's acknowledgment that the exclusion fundamentally undermined SAS's case, as the Fifth Circuit has held that such drastic outcomes are to be avoided.

**B.** The exclusion of Mr. Collins' testimony as improper expert opinion was an abuse of discretion. His particularized knowledge comes from his position as CTO and head of R&D, and the testimony he offered was based on his personal experience. Thus, it is simply erroneous that he was an undisclosed expert.

## ARGUMENT

## I.     STANDARD OF REVIEW

When addressing questions of copyright law, this Court "applies the law which would be applied by the regional circuit." *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1353 (Fed. Cir. 2014) (quoting *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990)).[2] Whether the "elements of [a] program that have been copied are protected expression" is "a mixed issue of fact and law." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 832 (10th

---

[2]     The Supreme Court's recent fair use opinion did not reverse this Court's copyrightability opinion cited herein. *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1197 (2021).

Cir. 1993); *see Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1342 (5th Cir. 1994) (endorsing *Gates*).  In copyright cases, such determinations are subject to "*de novo* review."  *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1073 (9th Cir. 2000).

The district court did not explain under what rule it dismissed SAS's copyright claim.  To the extent that it granted WPL summary judgment *sua sponte*, the Fifth Circuit reviews a "grant [of] summary judgment *de novo*," viewing "all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor."  *Raytheon Co. v. Indigo Sys. Corp.*, 688 F.3d 1311, 1315 (Fed. Cir. 2012).  To the extent that the district court tried the case under Rule 52, the Fifth Circuit "reviews conclusions of law *de novo* and findings of fact for clear error," reversing findings that "are based on a clearly erroneous view of the facts or a misunderstanding of the law."  *Ransom v. M. Patel Enters., Inc.*, 734 F.3d 377, 381 (5th Cir. 2013).  Evidentiary rulings are reviewed for an abuse of discretion.  *Caparotta v. Entergy Corp.*, 168 F.3d 754, 755-56 (5th Cir. 1999).

## II.   THE DISTRICT COURT'S FILTRATION ANALYSIS WAS FUNDAMENTALLY FLAWED

"To qualify for copyright protection, a work must be original to the author," meaning that it is "independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity."

36

*Feist*, 499 U.S. at 345; *see* 17 U.S.C. § 102(a). "The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Id.* at 345 (quotation marks omitted). As a result, courts routinely have found works less creative than computer programs to be copyrightable, including a yellow pages directory, *Key Publications, Inc. v. Chinatown Today Publishing Enterprises, Inc.*, 945 F.2d 509, 514 (2d Cir. 1991); estimates of coin values, *CDN Inc. v. Kapes*, 197 F.3d 1256, 1257-58, 1260-61 (9th Cir. 1999); pitchers' statistics, *Kregos v. Associated Press*, 937 F.2d 700, 702, 704 (2d Cir. 1991); and even a Chinese menu, *Oriental Art Printing, Inc. v. Goldstar Printing Corp.*, 175 F. Supp. 2d 542, 548 (S.D.N.Y. 2001).

"Copyright protection subsists … in original works of authorship fixed in any tangible medium of expression," including "literary works." 17 U.S.C. § 102(a). Computer programs—defined as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result," 17 U.S.C. § 101—are copyrightable as "literary works." *Google*, 141 S. Ct. at 1196. That protection extends to all of the expressive elements of a computer program, including "its source code and object code," as well as "the program architecture, 'structure, sequence and organization', operational modules, and computer-user interface." *Eng'g*, 26 F.3d at 1341. And like SAS's Input Formats and Output Designs, in *Engineering Dynamics*, the Fifth Circuit explained that copyright

37

protection also extends to "input formats," which are the way that a computer program receives data, and "output reports," which are how processed data is conveyed to a user. *Compare id.* at 1346 *with supra* 12, 16; *see also Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004) (copyright protects "the 'literal' elements of computer software" and "nonliteral elements, including its structure, sequence, organization, user interface, screen displays, and menu structures").

"To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist*, 499 U.S. at 361. The first element is not at issue here. Appx15. The second element involves two subsidiary questions, the first of which is "the factual question whether the alleged infringer actually used the copyrighted material to create his own work." *Eng'g*, 26 F.3d at 1340. Given that, as the district court found, there was "repeated evidence" of WPL's extensive "factual copying," that question also is not at issue. Appx15; *supra* 24. The second question is "whether the copying is legally actionable," which requires "a court to determine whether there is substantial similarity between the two works." *Eng'g*, 26 F.3d at 1341.

38

### A.     The District Court Misapplied the Burdens of Identifying Protectable and Unprotectable Elements

In assessing substantial similarity for computer programs, the Fifth Circuit uses the abstraction-filtration-comparison ("AFC") test. *Id.* at 1343 (citing *Gates*, 9 F.3d at 834); Appx5. In the AFC analysis, the program is first dissected "to its varying levels of generality." *Eng'g*, 26 F.3d at 1343. Then, at "each level of abstraction," "those elements of the program which are unprotectable" are filtered out. *Id.* Finally, the remaining protectable elements are compared with the allegedly infringing program. *Id.*

Critically, although the copyright owner has the ultimate burden on substantial similarity, as discussed below, the statute's text, Circuit courts, and treatises all agree that "the ***defendant*** … bears the burden of proving—as part of the filtration analysis—that the elements [it] copied from a copyrighted work are ***unprotectable***." *Compulife*, 959 F.3d at 1305.[3] The defendant carries its burden by showing that "the portion of the copyrighted work actually taken does not

---

[3]     In addition to the reasons set forth below explaining why this burden-shifting framework makes sense, the Fifth Circuit is particularly likely to agree with the Eleventh Circuit's recitation of the framework in *Compulife*. In *General Universal*, the Fifth Circuit declined to consider the standard, but cited approvingly the Eleventh Circuit's formulation. 379 F.3d at 143 n.26 (quoting *MiTek Holdings, Inc. v. Arce Eng'g Co.*, 89 F.3d 1548, 1555 (11th Cir. 1996) (requiring copyright owner to identify copied material before conducting filtration analysis)). *General Universal* is otherwise distinguishable because the copyright owner did not have proof of factual copying, *id.* at 145, which is not the case here. Appx15; *supra* 19.

satisfy the constitutional requirement of originality." *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1542 (11th Cir. 1996). Then, the copyright owner need only "respond[]" to the "appropriately narrowed issue." *Compulife*, 959 F.3d at 1306.

Requiring the defendant to prove unprotectability makes particular sense for three reasons. ***First***, it is consistent with the statutory presumption of validity afforded by SAS's registration certificates. Under 17 U.S.C. § 410(c), "the certificate of a registration made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate." *See Gen. Universal*, 379 F.3d at 141 ("A certificate of registration, if timely obtained, is prima facie evidence both that a copyright is valid and that the registrant owns the copyright."). "Once the plaintiff provides a certificate of registration, the burden shifts to the defendants, who must demonstrate that 'the work in which copyright is claimed is unprotectable (for lack of originality) or, more specifically, to prove that ... the copyrighted work actually taken is unworthy of copyright protection.'" *Engenium Sols., Inc. v. Symphonic Techs., Inc.*, 924 F. Supp. 2d 757, 776 (S.D. Tex. 2013) (quoting *Montgomery v. Noga*, 168 F.3d 1282, 1289 (11th Cir. 1999)); *see Boisson v. Banian, Ltd*, 273 F.3d 262, 269 (2d Cir. 2001) (holding that defendants "bear the burden of proving that [any particular element] is not original"); *Brocade Commc'ns Sys. Inc. v. A10 Networks Inc.*, No. 5:10-cv-03428, 2011 WL 7563043, at *2 (N.D. Cal. Aug. 16,

40

2011) ("presumption of validity … shifts the burden to [the defendant] to rebut that the allegedly copied elements are not protectable expression").  To hold otherwise would be inconsistent with Congress' intent to shift the burden to the defendant.

*Second*, it is consistent with the weight of judicial authority.  In *Boisson*, for example, the Second Circuit held that the *defendant* had to prove that the quilt design it copied was not original.  273 F.3d at 269.  Likewise, in *Society of Holy Transfiguration Monastery, Inc. v. Gregory*, the First Circuit chastised a *defendant* for not explaining what phrases were the subject of his assertion of unprotectability under the short phrases doctrine.  689 F.3d 29, 52 (1st Cir. 2012).  And, even prior to the Eleventh Circuit making the issue explicit in *Compulife*, it indicated in *Bateman* that the plaintiff must "*respond* to any proof advanced by the defendant that the portion of the copyrighted work actually taken" is not protectable.  79 F.3d at 1542 (emphasis added).  It is also the approach adopted by the well-respected *Nimmer on Copyright* treatise, 4 NIMMER ON COPYRIGHT § 13.03[F][3] ("defendant must go forward at trial with appropriate evidence as to those doctrines"), on which this Court and the Fifth Circuit frequently rely.  *See, e.g., Oracle*, 750 F.3d at 1364; *Eng'g*, 26 F.3d at 1343.

*Third*, it makes practical sense.  As the Eleventh Circuit explained in *Compulife*, "[p]rotectability can't practicably be demonstrated affirmatively but, rather, consists of the absence of the various species of *un*protectability.  If the

41

plaintiff had the burden of proving protectability, he would have to preemptively present evidence negating all possible theories of unprotectability just to survive a motion for summary judgment." 959 F.3d at 1305. Indeed, "some types of unprotectability can be negated only by presenting practically infinite evidence":

> A plaintiff, for instance, can't be expected to present the entirety of the public domain as it existed when he authored his copyrighted material in order to show that no elements of his work were taken from it. Nor could a plaintiff reasonably introduce the entire corpus of relevant, industry-standard techniques just to prove that none of the material copied from his work constituted *scènes à faire*.

*Id.* at 1305-06.

Here, although the district court relied on *Compulife*, stating that its "burden-shifting framework is a sensible way to determine copyrightability," and purporting to "adopt[] this framework," Appx14, it deviated from it in a critical way. It did not require WPL to explain how all of the material ***that it copied*** was unprotectable under a limiting doctrine. Instead, it merely required WPL to show that ***"some*** of the copyrighted work is not protectable expression," whether that material was part of SAS's claim or not. Appx15-16 (emphasis added). Under this standard, a defendant could copy the Obi-Wan/Darth Vader fight scene in *Star Wars* so long as it states that starships are *scènes à faire* in science fiction, or copy the song "Somewhere" from *West Side Story* so long as it shows that *Romeo and Juliet* is in the public domain. That is not the law. What matters is what WPL copied, not other parts of the work that it did not; and everything that it copied, not

42

some small piece. As the district court acknowledged, WPL did not do this. Yet, the court nevertheless concluded that because WPL listed off doctrines that could have applied to elements of the SAS System whether or not WPL copied them, the burden shifted to SAS to prove that all of the material that WPL copied was protectable.

This is precisely the error that the Eleventh Circuit reversed in *Compulife*: rather than the plaintiff having the "burden of proving that the elements … that the defendants copied were protectable," if a "defendant believes that … what he copied" is unprotectable, "he must indicate" why. 959 F.3d at 1305-06. In other words, WPL had to meet its burden that everything that it copied was unprotectable. It did not do this. This alone requires reversal and a remand for a jury trial to compare the copied elements to WPS.

## B. The District Court Also Misapplied the Federal Rules

In addition to misallocating the burdens as a matter of copyright law, the district court committed reversible error as a matter of civil procedure for two independent reasons.

*First*, the court misapplied the Federal Rules. Normally, a court addresses filtration at trial or summary judgment. For example, in *Aspen Technology, Inc. v. M3 Technology, Inc.*, the parties' experts presented their filtration opinions at trial, and the "jury, as the ultimate factfinder, was entitled to determine whether the

43

copied aspects of the program were entitled to copyright protection." 569 F. App'x 259, 270 (5th Cir. 2014).

"Although summary judgment on the issue of substantial similarity 'typically should be left to the factfinder,'" it "is appropriate if a court can conclude, after drawing all reasonable inferences in favor of the nonmoving party, that no reasonable juror could find in favor of the nonmovant." *Engenium*, 924 F. Supp. 2d at 786 (citing *Peel & Co. v. The Rug Mkt.*, 238 F.3d 391, 395 (5th Cir. 2001)). For example, in *Engenium*, the court granted summary judgment to the copyright owner because it presented evidence of copying, and the defendant "offered no evidence to disprove the[] similarities or otherwise show their insignificance in light of the full scope of the competing products." *Id.* at 788. By contrast, in *Peel*, the Fifth Circuit reversed summary judgment for the defendant because the copyright owner "raised genuine issues of material fact as to whether the claimed original constituent elements" of its rug were "protectible by copyright, and whether their use in the two rugs is substantially similar." *Peel*, 238 F.3d at 398. Summary judgment for a defendant is appropriate only where "the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Gen. Universal*, 379 F.3d at 142 (quoting *Herzog v. Castle Rock Ent.*, 193 F.3d 1241, 1247 (11th Cir. 1999)).

44

Here, the district court acknowledged that it could not filter the SAS System on summary judgment due to genuine issues of material fact. Appx1. Based on the foregoing cases holding that filtration involves factual questions requiring a trial, the court should have sent the case to the jury.

Instead, the court held the copyrightability hearing, and issued an opinion dismissing SAS's copyright claim without stating under what Federal Rule it purported to do so. Whether the court intended to proceed under Rule 56 or 52, it did not follow the procedural requirements. On the one hand, it appears that the district court intended to filter out unprotectable elements of the SAS System and then, having mistakenly concluded that WPL satisfied its burden, improperly found that "SAS has not shown the existence and extent of any remaining protectable work" and *sua sponte* granted WPL summary judgment on SAS's copyright claim. Appx12, Appx16-17. Yet, on summary judgment, the district court was required to view "all evidence in the light most favorable to the non-moving party," (here, SAS), and draw "all reasonable inferences in that party's favor." *Raytheon*, 688 F.3d at 1315. In that situation, the court should have sent the case to the jury. If the district court intended to evade the summary judgment requirements through a "copyrightability hearing," it erred.

On the other hand, if the court intended to decide filtration in a bench trial under Rule 52, it was required to "find the facts specially and state its conclusions

45

of law separately." Fed. R. Civ. P. 52(a)(1).  Yet, the court did not make any findings of fact with regard to the SAS Material copied by WPL.  Appx7-10. Likewise, it did not apply any analysis of the limiting doctrines to any portion of such material.  Appx16.  This too was an error, particularly as the record makes clear that the SAS Material survives filtration, making it appropriate for a jury to now compare the works.  *Infra* 47.

*Second*, regardless of the relevant Federal Rule, the district court improperly treated the proof of the SAS Material's protectability as a jump ball, such that it could not decide the issue, and then faulted SAS for that failure.  Having concluded that WPL arguably produced evidence that *some* unprotectable elements exist within the SAS System (as would be true for any work), the district court chided SAS for having "not shown the existence and extent of any remaining protectable" elements.  Appx17.  It then stated that this "raised the untenable specter of the Court taking copyright claims to trial without any filtered showing of protectable material within the asserted work," which was "not a result that this Court can condone."  *Id.*

That is exactly backward: when the district court determined that it did not have sufficient facts before it to determine whether the SAS Material WPL copied was protectable or unprotectable, it should have treated the material as protectable. As the Fifth Circuit has made clear, where a decision is "a question of law by the

46

Court" that "depends upon an inquiry into the surrounding facts and circumstances, the Court should refuse to grant a motion for summary judgment until the facts and circumstances have been sufficiently developed to enable the Court to be reasonably certain that it is making a correct determination of the question of law." *Palmer v. Chamberlin*, 191 F.2d 532, 540 (5th Cir. 1951). Likewise, in a copyright case, "the mere failure of the plaintiff to present evidence of protectability … isn't a sufficient reason to give judgment to the defendant." *Compulife*, 959 F.3d at 1306. "Rather, where the defendant's evidence is insufficient to prove that a particular element is unprotectable, ***the court should simply assume that the element is protectable and include that element in the final substantial-similarity comparison*** between the works." *Id.* (emphasis added). That is the opposite of what the district court did here.

The practical consequence of the district court's error is dire because, despite not actually finding that the SAS Material was unprotectable, it nevertheless dismissed SAS's copyright claim. Here, the district court improperly found that the copied SAS Material had "not been shown to be copyrightable," but it did not find that it was not protectable either. Appx18. This is yet another reversible error.

### C.    The Undisputed Facts Show that the SAS Material that WPL Copied Is Protectable As A Matter of Law

In all events, regardless of the district court's improper burden-shifting and

procedural errors, it ultimately erred by failing to find as a matter of law that the SAS Material that WPL copied was protectable. *First*, the record is replete with evidence of SAS's creative choices. As the Supreme Court explained in *Feist*, such choices are the essence of protectability. 499 U.S. at 345 (creative choices as to selection and arrangement are protectable); *Atari Games Corp. v. Oman*, 979 F.2d 242, 245 (D.C. Cir. 1992) (creative ordering of elements is protectable). Thus, analysis of copyrightability focuses on whether the copyright owner "exercise[s] any judgment in formulating" its works. *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 46 F.3d 408, 410 (5th Cir. 1995).

Here, the district court found that the SAS Material WPL copied was creative. Appx17. As noted above, SAS created the SAS Material from a sea of available alternatives and then continued to develop it over the past 45 years. With regard to the Input Formats, SAS's developers selected from a "large number of choices among the various elements." Appx322-323 ¶17. Likewise, Mr. Eaton discussed fourteen considerations that are involved in the creation of each Input Format. *Supra* 15. With regard to the Output Designs, WPL's own expert conceded that there were an "infinite number of possibilities," Appx3521:9-11. SAS chose its particular Output Designs based on numerous considerations. *Supra* 19. Other companies were able to achieve the same results without copying SAS, *supra* 21, which further shows that SAS's particular expression was protectable.

48

*See Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 840 (Fed. Cir. 1992) (evidence "showing a multitude of different ways to generate a data stream" made it protectable); *Compaq Comput. Corp. v. Procom Tech., Inc.*, 908 F. Supp. 1409, 1418 (S.D. Tex. 1995) (copyright owner's choices "reflect the requisite degree of creativity and judgment necessary to protect its compilation").

*Second*, the district court failed to acknowledge that copyright protection subsists in the original selection and arrangement of elements (whether those elements are protectable or not). *See Feist*, 499 U.S. at 348 ("[E]ven a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement."); *Oracle*, 750 F.3d at 1363 ("Because Oracle exercised creativity in the selection and arrangement of the method declarations when it created the API packages and wrote the relevant declaring code, they contain protectable expression that is entitled to copyright protection."). As the Second Circuit has explained, although "taken individually, the words that constitute a literary work are not copyrightable," that "does not prevent a literary text, i.e., a collection of words, from enjoying copyright protection." *Softel v. Dragon Med. & Scientific Comm'cns*, 118 F.3d 955, 964 (2d Cir. 1997) ("In *Feist*, the Court made quite clear that a compilation of non-protectible elements can enjoy copyright protection even though its constituent elements do not.").

49

The court's failure to consider SAS's selection and arrangement was a critical oversight as WPL did not show that the entirety of SAS's Input Formats or Output Designs were unprotectable, much less all of the SAS Material. *Infra* 50. As discussed above, the Input Formats are an intricate collection of keywords, "options, formats, informats, global statements, access engines and other elements." *Supra* 12 (quoting Appx9). Similarly, the Output Designs are compilations of "tables, graphs, and other forms of output," including "plots, colors, texts, and fonts," that together form the SAS System's screen display. *Supra* 16. Even had WPL established that stray elements of the SAS Material were unprotectable, WPL copied SAS's selection and arrangement of those elements, which too is protectable. *See S. Credentialing Support Servs., L.L.C. v. Hammond Surgical Hosp., L.L.C.*, 946 F.3d 780, 784 (5th Cir. 2020) ("Although laws and hospital policies dictate the contents of the credentialing forms, Southern Credentialing's unique selection and arrangement of information exhibit creative expression."); *Lipton v. Nature Co.*, 71 F.3d 464, 470 (2d Cir. 1995) ("The amount of creativity required for copyright protection of a compilation is decidedly small."). Thus, this Court should hold that the SAS Material that WPL copied is protectable and remand for a jury trial comparing the SAS Material to WPS.

**Third**, the evidence in the record makes clear that the SAS Material survives the filtration analysis. The entirety of the district court's discussion of the limiting

50

doctrines was limited to a single conclusory paragraph in which the court mentioned the names of some of these doctrines, but made no effort to apply those doctrines to the law or facts of this case, nor to decide whether WPL's assertions about them were correct. Appx16. When the principles referenced by the district court are applied properly, it is clear that the SAS Material is protectable:

Public Domain. Although WPL referenced the 1976 version of the SAS System that was in the public domain, WPL did not copy the 1976 version of the SAS System. Appx3517:15-18. Instead, to make a clone that customers wanted, it copied all of the enhancements and new material that SAS spent 45 years developing up to the present day. *Supra* 21. The Copyright Act makes clear that copyright extends to any ***new*** material added to a public domain work. 17 U.S.C. § 103(b) (copyright in a derivative work extends "to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work," and is "independent of . . . any copyright protection in the preexisting material"). That is why the fact that the publicity stills for *The Wizard of Oz* are in the public domain does not foreclose copyright protection in the film's visual elements. *Warner Bros. Ent. v. X One X Prods.*, 644 F.3d 584, 602 (8th Cir. 2011).

Thus, even if certain Procedure names existed in the public domain version of the SAS System, anything added or improved in the subsequent 45 years is protectable. As discussed above, by SAS 79.5, the SAS System represented

51

"overwhelmingly a new and original work of authorship, above and beyond the pre-existing work contained in earlier release [sic] of SAS." *Supra* 19. That is why, although WPL's expert was able to identify a handful of Procedure names that appeared in the 1976 version, Appx1992 ¶¶115-16, he admitted that the actual Input Formats, including the complex hierarchies discussed above, had "all changed, at least the ones [he] examined." Appx602:5-10. He did not even attempt to show that the statements, options, keywords, and other elements that WPL copied appeared in the 1976 version. Appx3514:7-9. Everything added after 1976, such as the 1990s introduction of PROC MIXED discussed above, *supra* 19, and the post-1976 enhancements to the existing Input Formats, is protectable. Appx3366:10-12.

SAS Language. WPL claimed that the "SAS Language" was not protectable, but labeling something a "language" does not make it unprotectable. The SAS System clearly qualifies as a copyrightable computer program, *supra* 9, and a program's input formats are a protectable part of it. *See Eng'g*, 26 F.3d at 1342 (input formats protectable element of program); *Control Data Sys., Inc. v. Infoware, Inc.*, 903 F. Supp. 1316, 1322 (D. Minn. 1995) (same); *Broderbund Software, Inc. v. Unison World, Inc.*, 648 F. Supp. 1127, 1132, 1137 (N.D. Cal. 1986) (same). They also satisfy the definition of a "computer program" as they are "a set of statements or instructions to be used directly or indirectly in a computer in

52

order to bring about a certain result."  17 U.S.C. § 101; *supra* 12, 36.  In any case,

a constructed language can be a protectable element of a work.  *See Paramount*

*Pictures Corp. v. Axanar Prods., Inc.*, No. 2:15-CV-09938, 2017 WL 83506, at *5

(C.D. Cal. Jan. 3, 2017) (Klingon language included in infringement analysis of

*Star Trek* works); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 253 F.

Supp. 2d 943, 951 (E.D. Ky. 2003) (programming language protectable), *rev'd on*

*other grounds*, 387 F.3d 522, 540 (6th Cir. 2004) (program creator's choices were

constrained and program served as "lock-out" code); *see also* Ronald L. Johnston

& Allen R. Grogan, *Copyright Protection for Command Driven Interfaces*, 12

COMPUTER L. INST. 1 (1991).[4]

Unoriginality.  WPL's arguments that the SAS System contained unoriginal

elements likewise were faulty.  First, although WPL's expert referenced open

---

[4]    The vacated North Carolina district court decision did "not reach the issue of whether the creator of a programming language could ever restrict its use by copyright."  *SAS Inst. Inc. v. World Programming Ltd.*, 64 F. Supp. 3d 755, 776 n.16 (E.D.N.C. 2014), *vacated*, *SAS I*, 874 F.3d at 390.  Further, although it suggested that no "license is needed" to use the Input Formats, *id.* at 776, it based that conclusion on a misreading of WPL's cited deposition testimony.  The witness actually testified that someone can "physically" write a SAS program, such as in a "text editor," not that, as a legal matter, a competitor can copy the Input Formats.  Appx1672 at 264:23-267:1; Appx1713 at 32:13-18 (no license needed to write "text file" as it "has no use" without the SAS System, which requires a license).  In any case, the coined term "SAS language" does not have a consistent meaning, and whatever its meaning is not determinative of copyrightability for the reasons discussed above.

source elements, nowhere did he conclude that the SAS Material contained such elements, Appx2020-2029 ¶¶140-43, nor did he provide a list of any allegedly third-party elements in the SAS Material.  Appx3514:21-23.  Second, the vast majority of the elements WPL's expert referenced were included in the 1976 SAS System.  Appx2037-2065 ¶¶152-70.  Thus, this adds nothing to the filtration analysis as any new elements or enhancements would be protectable.  *Supra* 47.  Moreover, many of the purported examples relate to ideas, not the way that SAS expresses them.  For example, although WPL's expert identified third-party software "capable of doing statistical correlation and analysis" or "data-modification and data-selection," Appx2057-2060 ¶¶162-66, he did not identify Input Formats or Output Designs similar to those copied by WPL, as would be required to conclude that the SAS Material is unprotectable.

Third, although WPL suggested that SAS's international subsidiaries may have authored parts of the SAS System, Appx2075-2077 ¶¶192-95, it never actually showed that any entity other than SAS owns copyrights in the SAS System, let alone in any of the SAS Material that WPL copied.  As SAS's registration certificates provide a presumption of ownership, *supra* 40, WPL would need to come forward with more than mere conjecture.  *See Lance v. Freddie Recs., Inc.*, 986 F.2d 1419 (5th Cir. 1993) (holding registration certificate "carries the plaintiff's burden of showing that he in fact owns the" work); *Engenium*, 924

54

F. Supp. 2d at 776 ("Once the plaintiff provides a certificate of registration, the burden shifts to the defendants …").[5]

Facts.  Although facts may not be protectable, the Supreme Court has made clear that the "compilations of facts are." *Feist*, 499 U.S. at 345.  Here, there are only three facts in the record that WPL argued should be filtered: a map of France, points in one scatterplot, and values in one chart.  Appx2030-2034 ¶¶147-49; *see also* Appx3515:11-14 (WPL did not offer "comprehensive list of all factual or data elements").  The way that the Output Designs present those facts, combining them with other elements, is protectable.  *Supra* 49.  In any case, WPL did not attempt to present evidence that all of the outputs it copied constituted only facts.

Idea/Expression.  As this Court explained in *Oracle*, copyright protection extends "to the expression of an idea" even if it does not extend "to the underlying

---

[5]    WPL also may argue that SAS does not hold the copyrights in the Output Designs because the outputs are generated as a result of users' interaction with the SAS System.  The district court, however, did not base its decision on this argument, tacitly rejecting it.  Appx16.  In any case, this argument is inconsistent with the Fifth Circuit holding that a computer program copyright includes output formats.  *Eng'g*, 26 F.3d at 1345; *see also Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1175, 1175 n.3 (9th Cir. 1989) ("A computer program is made up of several different components, including … the user interface," which "is generally the design of the video screen and the manner in which information is presented to the user."); *Control Data Sys.*, 903 F. Supp. at 1322 (output formats protectable).  Even where a user makes certain decisions in using a computer program, the copyright extends to the output if the program "does the lion's share of the work" in creating the output.  4 NIMMER ON COPYRIGHT § 13.03[F].  That certainly is the case here.  *Supra* 12.

idea itself." 750 F.3d at 1354; *see also Google*, 141 S. Ct. at 1196 ("copyrights protect 'expression' but not the 'ideas' that lie behind it" (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (2d Cir. 1936) (Hand, J.))). Thus, "even if" a work "conveys *unprotectable ideas,* the specific words, phrases, and sentences selected to convey those ideas are *protectable expression* under any reasonable abstraction analysis." *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 534 (5th Cir. 1994).

Here, this case is not about copying ideas, such as the ideas of a language processor and certain mathematical formulas. Appx2065-2070 ¶¶173-84. It is about WPL's copying of the SAS Material. *Supra* 21. That the Procedures use a mathematical formula does not lessen the expressiveness of SAS's Input Formats or Output Designs for those Procedures. The SAS Material is just as protectable as a textbook that describes the formulas. In any case, as Mr. Collins explained, although anyone could take an algorithm and implement it, SAS's particular expression of those algorithms took tremendous creativity, including "bring[ing] together the capability of the algorithm, the ability to scale that appropriately, to get repeatable and correct results within a standard flow and execution across procedures." Appx1354 at 35:5-11. Moreover, WPL did not provide a "list of all process, system, or method elements" or "a list of mathematical or statistical elements." Appx3515:3-10, Appx3515:15-18.

56

*Scènes à Faire*.  *Scènes à faire* "den[ies] protection to those expressions that are standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting."  *Gates*, 9 F.3d at 838.  In the context of computer programs, this means elements that, when they were created, were "dictated by external factors," such as "hardware standards and mechanical specifications … software standards and compatibility requirements … computer manufacturer design standards, target industry practices and demands … and computer industry programming practices."  *Id.*  All that WPL's expert was able to identify were a scattershot of stray elements that he claimed were unprotectable.  Appx2071-2074 ¶¶185-191, Appx2082-2083 ¶¶205-210.  What he was unable to do was to show that the entirety of any Input Format or Output Design was nothing but a stock element.  Appx3514:18-20 (admitting that he did not attempt to "provide a list of all *scènes à faire* elements that are in the SAS System").

Merger.  Merger means that the Copyright Act grants no protection for "the author's generalized ideas and concepts," only for the author's expression (*i.e.*, the "more precisely detailed realization of those ideas").  *Sparaco v. Lawler, Matusky & Skelly Eng'rs LLP*, 303 F.3d 460, 468 (2d Cir. 2002).  "Under the merger doctrine, copyright protection is denied to expression that is inseparable from or merged with the ideas, processes, or discoveries underlying the expression."

57

*Gates*, 9 F.3d at 838. If, however, "alternate expressions are available," merger does not apply. *Atari*, 975 F.2d at 840.

Here, there is no dispute that countless options were available to SAS. *Supra* 15, 19, 21. Faced with this, WPL argues that merger exists because SAS seeks to stop WPL from "processing elements of the SAS Language." Appx2081 ¶¶204. Yet that is just a rehash of its circular and unavailing language-focused argument. *Supra* 52. In any case, WPL did not "attempt to provide a list of all ideas that merge with those ideas that are in the SAS System." Appx3514:14-17.

<u>Short Phrases</u>. Although WPL argued that a handful of keywords used in the Input Formats were unprotectable under the short phrases doctrine, Appx2084 ¶214, that does not mean that every word is unprotectable. If that were true, copyists would be free to reproduce every book because they are a combination of words. Instead, although "[c]opyright does not protect individual words and 'fragmentary' phrases when removed from their form of presentation and compilation," short phrases are "subject to copyright in the form in which [they are] presented." *Hutchins v. Zoll Med. Corp.*, 492 F.3d 1377, 1385 (Fed. Cir. 2007); *accord Salinger v. Random House, Inc.*, 811 F.2d 90, 98 (2d Cir. 1987). Thus, "a short phrase may command copyright protection if it exhibits sufficient creativity." *Syrus v. Bennett*, 455 F. App'x 806, 809 (10th Cir. 2011) (quoting 1 NIMMER ON COPYRIGHT § 2.01[B]).

<p style="text-align:center">58</p>

Here, it is undisputed that the Input Formats are creative. Appx17. WPL's atomization of them to individual words or symbols simply makes no sense as it would deny protection to every book or, here, computer program. Moreover, WPL did not "attempt to provide a comprehensive list of all short phrases that are a part of the SAS System that need to be filtered out." Appx3514:10-13.

*** 

Given that WPL did not prove that all (or even a fraction) of the SAS Materials that it copied were unprotectable, the district court should have found infringement as a matter of law or, at a minimum, allowed a jury to compare the copied material to WPS. *See Kepner-Tregoe*, 12 F.3d at 534 ("damning similarity—nay identity—of organization and language" is "strong evidence" of infringement).

## III.    THE DISTRICT COURT IMPROPERLY EXCLUDED SAS'S WITNESSES' TESTIMONY BASED ON ITS LEGAL ERROR

The district court also erroneously excluded SAS's expert witness, Dr. Storer, as well as testimony from SAS's former CTO, Mr. Collins, regarding the SAS System. A district court "necessarily abuse[s] its discretion" by "bas[ing] its ruling on an erroneous view of the law." *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 564 n.2 (2014); *see also Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1317, 1320 (Fed. Cir. 2014). Here, as discussed below, the district court's decision is predicated on legal errors in two ways. *First*, it faulted Dr.

59

Storer for not conducting a filtration analysis based on its erroneous understanding

of the burden-shifting framework.  As the court admitted, this exclusion "[had] the

practical effect of leaving SAS without any supportable copyright claims."

Appx18 n.11.  ***Second***, the court did not allow SAS's fact witness to provide lay

testimony based on his "particularized knowledge derived from [his] position."

*Texas A&M Rsch. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 403 n.12 (5th Cir.

2003).  Because these decisions were based on an erroneous view of the filtration

analysis, and compromised SAS's case, they too should be reversed.

###   A.    Excluding Dr. Storer Was Improper For the Same Reasons As Its Dismissal of SAS's Copyright Claim

Expert testimony is a crucial part of assessing the substantial similarity of

computer programs.  *See Gates*, 9 F.3d at 834-35 ("use of experts will provide

substantial guidance to the court"); *see also* 4 NIMMER ON COPYRIGHT §

13.03[A][1][d] (expert testimony "essential to any analysis of the similarities

between computer programs").  Here, Dr. Storer was offered as an expert to

conduct an AFC analysis of the SAS System, which closely resembled his prior

analyses that other courts had accepted.  *See, e.g.*, *MathWorks, Inc. v. COMSOL

AB*, No. 6:06-cv-335 (E.D. Tex.); *Synopsys, Inc. v. Atoptech, Inc.*, No. 13-cv-2965,

2016 WL 80549, at *2 (N.D. Cal. Jan. 7, 2016); Appx3479:11-3480:3 (discussing

Dr. Storer's AFC analysis in *MathWorks*).  Dr. Storer testified to the abstraction of

the SAS System, and his filtration analysis, which did not filter out elements that

60

were capable of being expressed in different ways by other programs such as SPSS or R.  *See* Appx3394:5-13, Appx3401:4-3403:22.

Yet, with only cursory explanation, the district court excluded Dr. Storer's testimony because it felt his methodology would be "unreliable and unhelpful to the jury" due to its "failure to filter out unprotectable elements."  Appx17-18.  The court did not contend that Dr. Storer was unqualified—to the contrary, it accepted that he was "an expert for purposes of testimony today in the designated fields." Appx3389:10-12.  Nor did the court contend that Dr. Storer's abstraction analysis was unreliable.  Its sole basis for finding Dr. Storer's methodology unreliable was his filtration analysis.

As discussed above, however, it was not SAS's burden to "filter out unprotectable elements" from the SAS System, nor was it Dr. Storer's role.  *Supra* 38.  Rather, it was WPL's burden, and its expert's role, to identify the unprotectable components of the material it copied.  Yet, WPL's expert, Dr. Jones, merely listed off "species of unprotectable elements." Appx3495:4-21.

Moreover, even this methodological dispute should not have resulted in Dr. Storer's exclusion because it is well-settled that "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 384 F.3d 546, 562 (5th Cir. 2004)

61

(citation omitted). Thus, even where there are two competing approaches—as is common—the fact that a judge considers one approach to be more accurate "does not make other approaches inadmissible." *Apple*, 757 F.3d at 1315, 1319 (district court's conclusion that "there was a better way to calculate damages" did not support exclusion). Nor must Dr. Storer's testimony "establish the ultimate question of infringement to be relevant." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1326 (Fed. Cir. 2009) (reversing exclusion of expert testimony).

Evidently, the court's frustration at the mismatch between its and SAS's understanding of the filtration analysis led it to believe that Dr. Storer's testimony lacked credibility. Appx18 (referencing, without elaboration, Dr. Storer's "egregious conduct"). There, however, was nothing wrong with Dr. Storer's testimony. On direct examination, the district court barred Dr. Storer from testifying as to issues that were cited in the "comparison" section of his report, such as the core protectable expression within the SAS outputs. Appx3428:3-20. Yet, expert testimony is not confined to the boundaries of a given section of a report. *See Meyer Intell. Props., Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1373 (Fed. Cir. 2012). Meanwhile, much of the district court's frustration stemmed from Dr. Storer's reluctance to answer WPL's questions that were *entirely* outside of his report. Appx3432:3-3435:22 (SAS's copyright registrations); Appx3457:10-3458:15 (code). Moreover, as Dr. Storer attempted to parse WPL's wrong-way-

62

round questions, the district court grew impatient and annoyed, which did not help his comfort level. Appx3443:6-8 (interrupting to say that "the question doesn't call for a trip down memory lane"); Appx3452:23-25 (interrupting to say "[i]f you don't understand, say: I don't understand"); Appx3464:12-14 (calling for recess midway through testimony to admonish counsel). As the district court allowed its erroneous view of the burden-shifting framework to govern its exclusion of testimony, it abused its discretion.

Furthermore, to the extent that the court allowed a credibility determination to govern an exclusion under the *Daubert* standard, that too was improper. *See Alta Wind I Owner Lessor C v. U.S.*, 897 F.3d 1365, 1380 (Fed. Cir. 2018) (vacating exclusion based on expert credibility); *Apple*, 757 F.3d at 1320 (reversal due to court "questioning the factual underpinnings and correctness of [expert's] testimony"). By citing Dr. Storer's "egregious conduct" for the determination that his opinions would be "unreliable and unhelpful to the jury," the district court "overstep[ped] its gatekeeping role." *See Apple*, 757 F.3d at 1314 ("These tasks are solely reserved for the fact finder."). And to the extent the district court *was* purporting to sit as a fact-finder, "credibility is determined by the court on the full record, not as a preliminary matter on an abbreviated record." *Alta Wind*, 897 F.3d at 1381.

Finally, whatever the basis for the exclusion, the district court's error was

63

not harmless as it meant that SAS lacked the proof that the court believed it needed. That is important because one of the Fifth Circuit's factors in reviewing such decisions is "the importance of the excluded testimony." *E.E.O.C. v. Gen. Dynamics Corp.*, 999 F.2d 113, 115, 117 (5th Cir. 1993) (district court "abused its discretion by failing to consider the possibility of lesser sanctions than the total exclusion of the [] expert witness"); *U.S. v. Land*, No. 13-cv-4721, 2014 WL 906230, at *3 (E.D. La. Mar. 7, 2014) (even where factors favored exclusion, declining to exclude "defendants' sole expert in the case").[6] Yet, the district court acknowledged that excluding SAS's "only technical expert" devastated SAS's case. Appx18 n.11 ("[H]is exclusion has the practical effect of leaving SAS without any supportable copyright claims."). Thus, the exclusion was improper.

### B. The District Court Improperly Refused to Let Mr. Collins Testify Within His Personal Knowledge

Compounding this error, the district court erroneously excluded Mr. Collins' testimony regarding the SAS System's design on the basis that he was offering expert opinion. Yet, it is well-established that lay testimony based on particularized knowledge is permissible. *See Texas A&M*, 338 F.3d at 403 (proper for witness to testify "based on particularized knowledge based on his position as

---

[6]    Nor was there evidence of bad faith, without which exclusion was "unduly harsh." *See E.E.O.C.*, 999 F.3d at 117.

vice president of the research foundation"); *U.S. v. Valencia*, 600 F.3d 389, 416

(5th Cir. 2010) (per curiam) (proper for chief risk offer to testify based on the

"knowledge and analysis" that "were derived from duties he held"); *see also Union*

*Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 693 (Fed. Cir. 2001)

("We have allowed lay witnesses to express opinions that required specialized

knowledge." (quoting *U.S. v. Riddle*, 103 F.3d 423, 428 (5th Cir. 1997) (permitting

testimony where witnesses had "extensive personal experience in the oil drilling

industry" and "had contributed extensively to the prior art in this field"))).

Mr. Collins's personal knowledge of the SAS System came from decades as

CTO and head of R&D.  His testimony was no surprise to WPL, given SAS's

initial disclosures, hours of depositions, and previously-submitted declarations in

the case.  Nonetheless, the district court repeatedly excluded Mr. Collins'

testimony about his technical understanding of the SAS System, insisting that it

was expert opinion.  Appx3356:9-3357:5 (excluding testimony about inputs,

stating "he's got to know and have an opinion about what input formats are,"

which "probably does call for expert testimony"); Appx3357:12-3358:21 (asserting

that Mr. Collins's "experience is simply a way to put him in the context of an

expert"); Appx3360:6-21, Appx3375:1-3376:9 (excluding testimony concerning

the operation of Procedures, despite Mr. Collins attesting to personal knowledge of

each).[7]  Eventually, SAS was forced to "truncate" the direct examination

altogether.  Appx3380:4-5.

It was error to prohibit Mr. Collins from testifying about "how [the system]

works" and "how it interacts," while purporting to permit testimony about "what is

in the system."  Appx3360:12-14.  Indeed, for computer programs, it is difficult to

understand how a witness can do the latter and avoid the former.  In any event,

because Mr. Collins had personal knowledge of the SAS System's design, he was

entitled to testify based on his particularized personal experience.  *See Meyer*, 690

F.3d at 1377 (reversing exclusion of lay testimony, finding "no problem with

having [defendant's] CEO of thirty-six years testify to factual matters within his

personal knowledge"); *see also Steyr Arms, Inc. v. Beretta USA Corp.*, No. 2:15-

cv-01718, 2020 WL 2767359, at *5-6 (N.D. Ala. May 28, 2020) (permitting

testimony from party's R&D manager given "extensive personal knowledge of and

experience" with product at issue); *Fresenius Med. Care Holdings, Inc. v. Baxter

Int'l, Inc.*, No. 03-cv-1431, 2006 WL 1330002, at *3 (N.D. Cal. May 15, 2006)

(permitting lead engineer to testify as to "personal knowledge regarding the

---

7    The district court also was inconsistent as to what it viewed as expert
opinion.  It initially allowed Mr. Collins to testify "about how the SAS System
works," but when SAS asked him about how the SAS System's inputs worked, the
district court excluded the responses.  Appx3358:16-3360:21 ("I have no problem
with him telling the Court what is in the system, but him telling me how it works
and explaining how it interacts is across the line as far as expert testimony.").

machine and the way that it operates"); *Braun Corp. v. Maxon Lift Corp.*, 282 F. Supp. 2d 931, 933-34 (N.D. Ind. 2003) (permitting inventor to testify to "structure and function of the patented invention" based on his "extensive personal experience in the wheelchair lift field"), *aff'd*, 97 F. App'x 335 (Fed. Cir. 2004).

*** 

The cumulative effect of these errors was to hobble SAS's copyright case, which is improper. *See Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 269 (5th Cir. 2020) (reversing exclusion of testimony that "could devastate Plaintiffs' case" given that it formed "much of the evidentiary basis on which Plaintiffs opposed summary judgment"); *Meyer*, 690 F.3d at 1377 (reversing error that "had the cumulative effect of preventing Bodum from presenting the substance of its obviousness defense," which "resulted in a one-sided trial"). Thus, the exclusions should be reversed.

## CONCLUSION

SAS requests that this Court hold that the district court erred in its application of the filtration analysis, find that WPL copied protectable elements of the SAS System, and therefore vacate the judgment as well as reverse the district court's exclusion of SAS's witnesses' testimony, and remand for trial.

DATED: May 14, 2021

Respectfully submitted,

/s/ Dale M. Cendali

Dale M. Cendali
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446 4800

*Counsel for Plaintiff-Appellant*

# ADDENDUM

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| SAS INSTITUTE INC., | § | |
| | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:18-CV-00295-JRG |
| | § | |
| WORLD PROGRAMMING LIMITED, | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**ORDER AS TO COPYRIGHTABILITY**

On the eve of a jury trial in this case, the Court finds before it two opposing motions for summary judgment on copyrightability.  These motions[1] present the Court with the task of having to resolve copyrightability within the framework of Federal Rule of Civil Procedure 56.  As a result, the Court is forced to either find there are no genuine issues of material fact, and grant one of the competing motions, or find there is a material question of fact, in which case it must deny both motions thereby injecting copyrightability into the jury trial and unavoidably making it part of the jury's infringement analysis.  Neither option is faithful to the precedent which the Court finds controlling.

Various authorities hold that copyrightability is at least in part a question of law, reserved for determination by the Court.  *See, e.g.*, *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1353 n.3 (Fed. Cir. 2014) (collecting cases).  On the other hand, copyright infringement is a question properly placed before the fact finder—in  this case, the jury.  For the jury to make a clear and reliable determination of whether infringement exists as to the asserted non-literal elements of the

---

[1] The "Summary Judgment Motions."  (Dkt. Nos. 264, 272.)

Appx1

computer software at issue, the Court is persuaded it should take up and decide the issue of copyrightability in a separate evidentiary hearing, not in the restrained posture of a Rule 56 motion. This would be consistent with Circuit precedent holding that copyrightability is at least in part a question of law.  *See Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1341 (5th Cir. 1994); *Oracle*, 750 F.3d at 1353 n.6 (collecting cases).

Consequently, the Court hereby **ORDERS** that the trial in the above-captioned case is **CONTINUED** from its present trial setting until such a copyrightability hearing before the Court can be held.  In light of this continuance and except for SAS Institute Inc.'s Motion for Leave to File Second Amended Complaint (Dkt. No. 210) and World Programming Limited's Motion for Leave to Serve Deposition on Written Questions on Luminex (Dkt. No. 418), the Court **DENIES AS MOOT** the Summary Judgment Motions and all other pending motions in the Court's docket in this case, **WITHOUT PREJUDICE** to refile them at a later and more appropriate date.  The Court resets this case for pretrial conference at 9:00 am on **Tuesday, November 24, 2020**, and for jury selection and trial for 9:00 am on **Monday, January 4, 2021**.

The Parties are further **ORDERED** to appear for a copyrightability hearing before the Court on **Wednesday, October 14, 2020**.  At such copyrightability hearing the parties will present evidence in support of the abstraction and filtration steps of the abstraction-filtration-comparison ("AFC") test, as addressed in *Computer Assocs. Int'l, Inc. v. Altai, Inc.*,  982 F.2d 693, 706 (2d Cir. 1992) and later adopted by the Fifth Circuit in *Engineering Dynamics*.  26 F.3d at 1341. It is intended that this hearing will facilitate a determination by the Court as to what is the *core protectable expression*, if any, covered by each asserted work.  Should the Court identify any such *core protectable expression*, then such determination will subsequently facilitate an accurate "comparison" as part of the infringement analysis by the jury.  Such copyrightability hearing will begin at 9:00am and conclude at 4:00pm on October 14, 2020 in Marshall, Texas.

Appx2

Each side will have three hours to present evidence and argument to the Court.  In advance of such, the parties shall brief the copyrightability issue for each asserted work as follows:

| | |
|---|---|
| SAS Institute Inc.'s ("SAS") Opening Brief (not to exceed 30 pages) | September 7, 2020 |
| World Programming Limited's ("WPL") Responsive Brief (not to exceed 30 pages) | September 21, 2020 |
| SAS's Reply (not to exceed 10 pages) | September 25, 2020 |
| WPL's Sur-Reply (not to exceed 10 pages) | October 2, 2020 |

The above briefing and page limits apply for all asserted works and not for each asserted work.

**So ORDERED and SIGNED this 24th day of August, 2020.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

3

Appx3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| SAS INSTITUTE INC., | § | |
| | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO.  2:18-CV-00295-JRG |
| v. | § | |
| | § | |
| WORLD PROGRAMMING LIMITED, | § | |
| | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

The Court conducted a Copyrightability Hearing on October 14, 2020.  Having considered the arguments of the parties, the related briefing, the evidence presented, and the relevant authorities, the Court finds that the works asserted in the above-captioned case have not been shown to be copyrightable, and therefore plaintiff's copyright claims should be and hereby are **DISMISSED WITH PREJUDICE**.

Also before the Court is World Programming Limited's ("WPL") Motion to Renew Dkt. Nos. 275 & 308 (the "Motion to Renew") (Dkt. No. 457), which the Court hereby **GRANTS**. Furthermore, the Court **GRANTS** Defendants'[1] Corrected Motion to Exclude the Testimony of Dr. James Storer on Issues Related to Copyright Infringement (the "Motion to Exclude").  (Dkt. No. 275.)   The Court **DENIES AS MOOT** Defendants' Motion to Strike Portions of the Declaration of Keith Collins (Dkt. No. 308).[2]

---

[1] Since the filing of the Motion to Exclude, several Defendants have been dismissed.  The Court treats the Motion to Exclude as Defendant World Programming Limited's Motion.

[2] The parties represented to the Court that they were in agreement that Mr. Keith Collins's testimony would be admissible to the extent that he was disclosed by SAS.  Accordingly, the Court considers the declaration and testimony of Mr. Collins to the extent he was disclosed by SAS, which includes "history and operations of SAS, including company research and development of

Appx4

## I.     BACKGROUND

On the eve of a jury trial in the above-captioned case, the Court found before it two opposing motions for summary judgment on copyrightability.  It became apparent to the Court that the copyright claims asserted by Plaintiff SAS Institute Inc. ("SAS") were not capable of going to trial until a determination of the protectable parts of the works was achieved.  Finding that resolving copyrightability within the limited framework of Federal Rule of Civil Procedure 56 would not be faithful to precedent, the Court issued an Order as to Copyrightability (Dkt. No. 436) and set a Copyrightability Hearing to allow the parties to present evidence in support of the abstraction and filtration steps of the abstraction-filtration-comparison test, as addressed in *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 706 (2d Cir. 1992) and later adopted by the Fifth Circuit in *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1341 (5th Cir. 1994).  By means of this Copyrightability Hearing, the Court sought to determine and identify what core protectable expression, if any, was covered by each asserted work.

## II.    LEGAL STANDARDS

Copyright subsists in "original works of authorship fixed in any tangible medium of expression."  17 U.S.C. § 102(a).  A work is original to the author when it was independently created and reflects a modicum of creativity.  *Feist Publ'ns v. Rural Tel. Serv.*, 499 U.S. 340, 344–45 (1991).  "The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be."  *Id.*  Originality does not require novelty.  *Id.*  Further, copyrightable works may contain both protectible and unprotectible elements.  *Id.*

---

the SAS System, SAS System input formats and output designs, and registration of copyrights." (Dkt. No. 408-1 at 2.)

Appx5

To establish copyright infringement, a copyright owner must show "ownership of a valid copyright" and "copying of constituent elements of the work that are original." *Id.* at 362.  "A certificate of registration, if timely obtained, is prima facie evidence both that a copyright is valid and that the registrant owns the copyright." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004); *see also* 17 U.S.C. § 14(a).  To show actionable copying (i.e., copying of original elements of the work), a plaintiff must show two things: (1) the defendant actually used the copyrighted material to create his work, and (2) probative similarity, which "requires a showing that the works, 'when compared as a whole, are adequately similar to establish appropriation.'" *Id.* (quoting *Peel & Co., Inc. v. The Rug Market*, 238 F.3d 391, 397 (5th Cir. 2001)).

It is settled law that, to at least some extent, software is entitled to copyright protection. Copyright protection as to software can extend not only to "literal" elements (i.e., source code, assembly code, object code), but also to "non-literal" elements (structure, sequence, organization, operational modules, user interface, etc.).  *Eng'g Dynamics,* 26 F.3d at 1341.  SAS here alleges that WPL has copied non-literal elements, namely the SAS System's input formats, output designs, and naming and syntax.  (Dkt. No. 441 at 3;  *see* Transcript of 10/14/2020 Copyrightability Hearing.)

In assessing infringement of non-literal elements, the Fifth Circuit has adopted the "adaption-filtration-comparison" (AFC) test posited by the Tenth and Second Circuits and Nimmer on Copyright, and widely adopted by other courts.  *Id.*; *see also Altai*, 982 F.2d 693; *Gates Rubber Co. v. Bando Chem. Indus.*, 9 F.3d 823 (10th Cir. 1993).  The AFC test entails three steps: (1) dissecting the program into its constituent levels of generality ("abstraction"); (2) filtration of unprotectible elements, such as ideas, facts, processes, public domain material, merger material, and *scènces à faire*; and (3) comparison of the remaining "golden nugget" or "core" of protectible

3

Appx6

elements to the work accused of infringement to determine whether the defendant has copied the plaintiff's protected expression.

Copyrightability is a question of law for the Court, but copyright infringement is a question for the trier of fact.  3 NIMMER ON COPYRIGHT § 12.10[A], [B][1].  Accordingly, the AFC test seeks to "filter[] out" nonprotectable elements such that such that "there remains a 'core protectable expression.'"  *Gen. Univ. Sys.*, 379 F.3d at 142 (quoting *Gates Rubber*, 9 F.3d at 841). If a core of protectable expression is found, "[t]ypically, the question whether two works are substantially similar,"—i.e., the infringement analysis—"should be left to the ultimate factfinder." *Id.*

Accordingly, in its Order setting a Copyrightability Hearing, the Court ordered the parties to:

> present evidence in support of the abstraction and filtration steps of the abstraction-filtration-comparison ("AFC") test, as addressed in *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 706 (2d Cir. 1992) and later adopted by the Fifth Circuit in *Engineering Dynamics*. 26 F.3d at 1341. It is intended that this hearing will facilitate a determination by the Court as to what is the core protectable expression, if any, covered by each asserted work. Should the Court identify any such core protectable expression, then such determination will subsequently facilitate an accurate "comparison" as part of the infringement analysis by the jury.

(Dkt. No. 436 at 2.)

### III.   FINDINGS OF FACT

SAS Institute Inc. offers customers "an integrated range of software products known as the 'SAS System'" which "enables users to perform a variety of tasks related to data access, data management, data analysis (including statistical analysis), and data presentation."  (Dkt. No. 128 at 5 (¶ 21).)  The SAS System allows a user to use its functionalities by entering a user-created program into the SAS System graphical user interface.  (*Id.* at 6 (¶ 27).)  Users write commands in the SAS Language—a high-level programming language developed and maintained by SAS—

Appx7

that instruct on what data analysis algorithms to run.  (*Id.* at 7 (¶ 30); Dkt. No. 264-1 ¶ 6; *see also* Testimony of Keith Collins at 10/14/2020 Copyrightability Hearing (stating that the SAS Software is a "programming language").)

An earlier version of the SAS Software called "SAS 76"[3] is in the public domain.  *S & H Computer Sys., Inc. v. SAS Insti., Inc.*, 568 F. Supp. 416, 419 (M.D. Tenn. 1983); *see also* Dkt. No. 272-3 at 63:13–15 (acknowledging SAS 76 is public domain).  Many of the PROCs (or procedures) used in SAS 76 are identically named to those in current versions of the SAS Software. (Dkt. No. 451-25 ¶¶ 115–116.)  Many of the output designs are also identical or nearly-identical. (*Id.* at 53–56.)

Part of the SAS System are "PROCs" that the user may use to perform various analyses on data.  (Dkt. No. 264-1 ¶ 9.)  Every SAS PROC is separately written and has its own design including its own syntax, options, statements, and defaults.  (*Id.*)  Each PROC corresponds to a separately identified piece of prewritten, specialized software that runs so as to give the user the desired data analysis.  (*Id.*)  Ultimately, the PROCs are what the user uses to write its program, and the PROCs make the functionality of the software available to the user.  (Dkt. No. 441-2 ¶ 3.) PROCs enable data analysis functionality through mathematical and statistical algorithms, calculations, variables, and measurements, such as FACTOR (to give a common factor), DISTANCE (to calculate a distance between data points), and STDIZE (to standardize numeric variables).  (Dkt. No. 441-3 at 16–17.)

When the user runs programs in the SAS Language, he or she is able to view the results of the data analysis through tables, graphs, and other forms of output on the screen.  (*Id.* ¶ 11.)  Much

---

[3] The name is due to the fact that SAS Institute was formed in 1976.  (Dkt. No. 441-3 at 6.)  "SAS 76" is an early version of the software.

5

of the output is viewed through the SAS Output Delivery System, or ODS.  (*Id.*)  The output can be viewed by the user graphically, such as through the use of tables, graphs, charts, plots, colors, texts, and fonts.  (Dkt. No. 441 at 13; Dkt. No. 441-2 at Fig. 2; Dkt. No. 264-1 ¶ 11.)

SAS holds myriad copyrights in various aspects of the SAS System.  (Dkt. No. 264-1 ¶¶ 19–22; Dkt. Nos. 261-4, 264-5, 264-6.)  In the present case, SAS asserted rights in the SAS System software (the "Asserted Works" or "SAS System").  (Dkt. No. 441 at 3, 5; *see* Transcript of 10/14/2020 Copyrightability Hearing at 13–18.)  The asserted SAS System includes input formats, output designs, and keywords.  (Dkt. No. 441 at 3.)  Input formats include "the collection of PROCs, statement, options, formats, informats, global statements, access engines and other elements available to the user and the syntax, all of which govern what the user's input must look like."  (Dkt. No. 441-3 at 26.)  Output designs include "the collection of content and formatting, including default parameters, used to display information in response to the user's input."  (*Id.* at 27.)  Keywords include "[n]aming and syntax of individual PROCs, statements, options, default parameters, and other elements."  (*Id.*)

WPL creates a product that competes with the SAS Software known as the World Programming System (WPS).  (Dkt. No. 264-11 at 30–31.)  WPL created its integrated system of software products to run applications that users have written in the SAS Language.  (*Id.*)  WPL's business was to "clone" the SAS Software.  (Dkt. No. 264-8 at 3 (internal WPL documentation explaining that "[o]ur base position is always to do what SAS does"); Dkt. No. 264-9 at 1 (internal WPL e-mail commenting that the "focus" of WPS is to be "a follow my leader SAS cloner"); Dkt. No. 264-10 (internet forum posting by WPL employee explaining that "[w]hat we're doing is equivalent to SAS data libraries.  Identical in fact as we write a SAS clone.").)  Accordingly, WPS

6

Appx9

emulates the SAS System by "[p]ars[ing] SAS Language input files" to "[p]roduce equivalent data output" and "[p]roduce[] similar graphical output."  (Dkt. No. 264-11 at 30–31.)

SAS presented a single technical expert, Professor James Storer, upon whom it relied for his copyrightability opinions.  Despite much obfuscation,[4] Professor Storer ultimately did not filter out any unprotectable material from the asserted works.  (Dkt. No. 451-9 at 156:22–157:25, 158:16–160:14, 160:19–164:18; Dkt. No. 441-2 ¶ 18 (Declaration of James Storer containing a single cursory paragraph on "The Filtration Step"); *see also* Transcript of 10/14/2020 Copyrightability Hearing Transcript at 170–178 (including testimony by Professor Storer that he did not filter out SAS 76).)  Instead, Professor Storer purportedly "filtered out" the two highest levels of his proposed abstraction; i.e., the main purpose of the program and the interface mechanisms.  (Dkt. No. 441-3 at 30–40.)  However, he maintained that all collections of input formats; collections of output designs; and the naming and syntax of individual functions, commands, operators, keywords, special characters and data types were wholly protectable.  (*Id.*)

IV.   **CONCLUSIONS OF LAW**

A.   **Abstraction**

"The purpose of segmenting a computer program into successive levels of generality is to 'help a court separate ideas [and processes] from expression and eliminate from the substantial similarity analysis those portions of the work that are not eligible for copyright protection.'" *Eng'g Dynamics*, 26 F.3d at 1342 (quoting 3 Nimmer, § 13.03[F] at 13–102.17).

SAS's technical expert, Professor Storer, conducted the abstraction step by breaking the SAS System into five levels of abstraction:

1. Main purpose of the program;

---

[4] As discussed *infra* at Section IV.E.

7

2. Interface mechanism;

3. Input formats (including the collection of PROCs, statements, options, formats, input formats, global statements, access engines and other elements available to the user and the syntax, all of which dictate what the user's input must look like);

4. Output designs (the collection of content and formatting, including default parameters, used to display information in response to the user's input); and

5. Naming and syntax of individual PROCs, statements, options, default parameters, and other elements.

(Dkt. No. 441 at 11; Dkt. No. 441-2 ¶ 11.)

WPL's expert Dr. Jones conducted the abstraction step by breaking the asserted SAS

System into six layers:

1. The Main Purpose of the Program – the main purpose or ultimate function of the program is to provide ways of performing statistical analysis and view the results, including by letting users execute programs written in the SAS Language;

2. The Program Architecture – the program architecture is the overall set of components and relationships between them that work together to operate in a certain way;

3. Modules – the data modules contain algorithms and data structures and represent functions or operations that can be carried out to accomplish a given task, such as an operation to read and store input data;

4. Algorithms and Data Structures – the algorithms are the processes or sets of rules that are followed in an operation to solve a problem, such as a particular formula or set of steps to calculate a regression. The data structures are the stores of values and attributes about them or relationships between them, such as an object with information about a dataset;

5. Source Code – the source code is the set of human-readable code or instructions written by programmers or developers that, when compiled into object code, comprise the object code that is run and launches the SAS software; and

6. Object Code – the object code is the machine-readable code or instructions (as would be in an executable) that when run launches the SAS software and allows the user to interact with it.

(Dkt. No. 451 at 26–27.)

The six layers of abstraction laid out by WPL are taken from the framework laid out in

*Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823 (10th Cir. 1993). The *Gates*

*Rubber* framework was adopted by the Fifth Circuit in *Engineering Dynamics*. 26 F.3d at 1342–

8

Appx11

3, n.10.  Accordingly, the Court proceeds with the layers of abstraction set out by WPL, as rooted in the AFC case law.[5]

### B.    Filtration

Various authorities hold that copyrightability is, at least in part, a question of law, reserved for determination by the Court. *See, e.g., Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1353 n.3 (Fed. Cir. 2014) (collecting cases). On the other hand, copyright infringement itself is a question properly placed before the fact finder—in this case, the jury. Where rights in non-literal elements of computer software are at issue, the analysis mandated by the Fifth Circuit—the AFC analysis—includes aspects of both questions.  In order for the jury to make a clear and reliable determination of whether infringement exists as to the asserted non-literal elements of the computer software at issue (and consistent with Fifth Circuit precedent holding that copyrightability is at least in part a question of law) the Court now undertakes the filtration of nonprotectable elements to discern what, if any, "core protectable expression" remains.  *Gen. Univ. Sys.*, 379 F.3d at 142 (quoting *Gates*, 9 F.3d at 841).  Accordingly, the Court "filters out" ideas, facts, information in the public domain, merger material, and *scènces à faire*.  *Eng'g Dynamics*, 26 F.3d at 1344.

The present copyrightability dispute between the parties largely centers around a difference in the scope of filtration.  "Filtration should eliminate from comparison the unprotectable elements of ideas, processes, facts, public domain information, merger material, *scènces à faire* material, and other unprotectable elements suggested by the particular facts of the program under examination." *Id.* at 1343 (quoting *Gates Rubber*, 9 F. 3d at 834).  The filtration analysis therefore

---

[5] Generally, the parties' differences as to the abstraction element of the AFC analysis are minor. The Court therefore adopts the proposal rooted in the progeny of cases adopted by the Fifth Circuit. Were the Court to adopt a different schema of abstraction, the outcome of the filtration element *infra* would not change.

9

Appx12

may result in filtering out as unprotectable *all* elements of an asserted work, or filtering out *no* elements of an asserted work, or somewhere in-between (i.e., finding that some but not all elements of an asserted work are entitled to protection). However, without performing any filtration at all, the subsequent comparison element of the test is flawed by definition because it is potentially burdened with unprotectable material. The goal of the filtration analysis is to lead to an accurate and fair comparison, which facilitates the ultimate infringement determination by the finder of fact.

### C.    Burden of Proof Framework

The Fifth Circuit has not presently provided clear authority on the burden of proof in the filtration analysis of copyrightability. However, the Eleventh Circuit recently addressed this issue in *Compulife Software Inc. v. Newman*. 959 F.3d 1288 (11th Cir. 2020). In *Compulife*, the Eleventh Circuit held that a burden-shifting framework was appropriate, in which plaintiff first proves a valid copyright and factual copying. *Id.* at 1306. The burden then shifts to defendant to "prove that some or all of the copied material is unprotectable." *Id.* If the defendant so shows, the burden shifts back to the plaintiff to respond.[6]

In grappling with "the burden of proof applicable to the filtration step[7] of the substantial-similarity analysis," the Eleventh Circuit noted that although unprotected material has been disregarded in the copyright analysis for at least a century, "[c]onceiving of filtration as a distinction step in the infringement analysis [ ] came into the law relatively recently." *Id.* at 1303. "Filtration can be tricky because copied material may be unprotectable for a wide variety of

---

[6] In *Compulife*, the Court found that "the burden shifts back to the plaintiff to prove substantial similarity between any remaining (*i.e.*, unfiltered) protectable material and the allegedly infringing work." 959 F.3d at 1306.

[7] Like the Fifth Circuit, the Eleventh Circuit has adopted a version of the Abstraction-Filtration-Comparison test from *Altai*. *Compulife*, 959 F.3d at 1303.

10

Appx13

reasons." *Id.* at 1304.  Relying on the foremost treatise on Copyright Law, *Nimmer on Copyright*, the Eleventh Circuit noted that the plaintiff in a copyright action is to "respond to any proof advanced by the defendant that the portion of copyrighted work actually taken does not satisfy the constitutional requirement of originality."  *Id.* at 1305 (quoting *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1542 (11th Cir. 1996) (citing Nimmer on Copyright § 13.03[F][3])).  The Eleventh Circuit also noted that placing the whole of the burden on the plaintiff would "unfairly require him to prove a negative," by demonstrating that the whole universe of unprotectability did not exist. *Id.* at 1305 ("If the plaintiff had the burden of proving protectability, he would have to preemptively present evidence negating all possible theories of unprotectability just to survive a motion for summary judgment." *Id.* (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993)).  "Placing the burden on the defendant, by contrast, merely requires him to identify the species of unprotectability that he is alleging and to present supporting evidence where appropriate."  *Id.* at 1306.  "The plaintiff then faces the manageable task of responding to the appropriately narrowed issue."  *Id.* (internal quotations and citations omitted).

This burden-shifting framework is a sensible way to determine copyrightability, and the Court adopts this framework.  WPL correctly points to *Engineering Dynamics* for the proposition that "to establish copyright infringement, a plaintiff must prove ownership of a valid copyright and copying of constituent elements of the work that are copyrightable."  (Dkt. No. 451 (citing *Eng'g Dynamics*, 26 F.3d at 1340) (emphasis and internal quotations omitted).)  The initial copyrightability burden rests on the party asserting copyright infringement.  Indeed, the Court recognized as much implicitly by requiring SAS to file the opening brief on copyrightability.  (Dkt. No. 436 at 3.)  However, that initial burden is not heavy.  A registered copyrighted work should

11

Appx14

be entitled to a presumption of protectability.[8]  A copyrighted work comprises numerous elements, many of which may be protectable, and many of which may be unprotectable.  Thus, once a plaintiff has established some extent of protectability, the burden shifts to the defendant to show there are elements within the work which are not entitled to protection.

It only makes sense that the burden should shift to the defendant once the plaintiff establishes a threshold of protectability.  "Protectability can't practically be demonstrated affirmatively but, rather, consists of the absence of the various species of *un*protectability." *Compulife*, 959 F.3d at 1305 (emphasis in original).  Once the plaintiff establishes that he has something protectable, the defendant may come forward with evidence that what it has copied— as preliminarily established by plaintiff—is not protectable.  The defendant's burden "merely requires him to identify the species of unprotectability that he is alleging and to present supporting evidence where appropriate."  *Id.* Should the defendant establish that at least some of the copyrighted work is not protectable expression, the burden shifts back to the copyright holder to undertake the "manageable task" of establishing which parts of its asserted work are, in fact, properly entitled to protection. *Id.* at 1306.

### D.    Burden Shifting As Done By The Parties

Here, Plaintiff SAS showed that it holds a registered copyright, amply argued that its asserted works are creative,[9] and presented repeated evidence of factual copying.  Accordingly,

---

[8] This presumption of protectability is in addition to the presumption of validity afforded to registered copyrights. *Gen. Universal Sys.,* 379 F.3d at 141.

[9] SAS attempts to analogize the copyrightability of its input formats to the Supreme Court's current consideration of copyright protection of software in *Google LLC v. Oracle America, Inc.*, No. 18-956.  In so doing, SAS collapses its shifting burden to show protectability into a mere showing of a modicum of creativity.  As discussed *infra*, a showing of protectability is more extensive than merely showing that an asserted work contains some "minimal degree of creativity" in any part of the work, however small. *Feist*, 499 U.S. at 345.  In any event, the Court does not find the issues squarely before the Supreme Court in *Google LLC v. Oracle America, Inc.* to be controlling here.

12

Appx15

SAS shifted the burden to WPL.  Defendant WPL then came forward with evidence showing that material within the copyrighted work was unprotectable.  However, SAS thereafter failed to show any remaining protectability, either by affirmatively showing some elements of the work to be protectable or by combatting Defendant's showing of unprotectability.

After SAS shifted the initial burden, Defendant WPL was required to show what it copied was unprotectable.  WPL established that at least some of the asserted works were unprotectable because they were in the public domain, including anything ported into the present-day SAS System from SAS 76.  (Dkt. No. 451-25 ¶¶ 65–66, 108–214; *see* Transcript of 10/14/2020 Copyrightability Hearing at 191–201.)  WPL presented evidence that the SAS Language should be filtered out, as it is open and free for public use.  (Dkt. No. 451-25 at ¶¶ 124–126; *SAS Insti.*, 64 F. Supp. 3d at 762; *see* Transcript of 10/14/2020 Copyrightability Hearing at 191–201.)  WPL additionally presented evidence that the SAS System contained unprotectable open source elements (Dkt. No. 451-23 ¶¶ 139–145); factual and data elements (*Id.* ¶¶ 146–150; *see* Transcript of 10/14/2020 Copyrightability Hearing at 191–201); elements not original to SAS (Dkt. No. 451-25 ¶¶ 151–172); mathematical and statistical elements (*Id.* ¶¶ 173–179); process, system, and method elements (*Id.* ¶¶ 180–184); well-known and conventional display elements, such as tables, graphs, plots, fonts, colors, and lines (*Id.* ¶¶ 185–191; *see* Transcript of 10/14/2020 Copyrightability Hearing at 191–201); material for which SAS Institute Inc. is not the author (Dkt. No. 451-25 ¶¶ 192–195); merged elements (*Id.* ¶¶ 196–204; *see* Transcript of 10/14/2020 Copyrightability Hearing at 191–201); statistical analysis *scènces à faire* elements (Dkt. No. 451-25 ¶¶ 205–210); and short phrase elements (*Id.* ¶¶ 211–214).

WPL therefore produced ample evidence that unprotectable elements exist within and as a part of the SAS System, identifying many "species of unprotectability" contained in the asserted

Appx16

works. *Compulife*, 959 F.3d at 1306.  Once a defendant establishes that at least some of the material is not entitled to protection, the burden shifts back to the plaintiff to "face[] the manageable task of responding to the appropriately narrowed issue" and combat the allegations. *Id.*  This may occur either by showing what defendant alleges as not protectable actually is entitled to protection, or by coming back and showing that there are remaining and identifiable protectable elements that defendant copied.[10]

SAS has done neither.  SAS has not attempted to show what WPL pointed to as unprotectable is indeed entitled to protection.  (Dkt. No. 441-2 at 7 n.1, 12; *see* Transcript of 10/14/2020 Copyrightability Hearing at 170–178.)  Similarly, SAS has not shown the existence and extent of any remaining protectable work.  Instead, when the burden shifted back to SAS, it was clear SAS had done no filtration; they simply repeated and repeated that the SAS System was "creative." (Dkt. No. 451-9 at 156:22–157:25, 158:16–160:14, 160:19–164:18; *see also* Transcript of 10/14/2020 Copyrightability Hearing at 170–178.)  SAS's failures have raised the untenable specter of the Court taking copyright claims to trial without any filtered showing of protectable material within the asserted work.  This is not a result that this Court can condone.  These failures rest solely on SAS and the consequences of those failures necessarily rest upon SAS as well.

### E.     Exclusion of Dr. James Storer

Separately and in light of the particularly meager AFC analysis performed by Dr. Storer– which can, at best, be described as scant—the Court finds that his analysis and methodology are

---

[10] The *Compulife* Court focused only on this second ability for a plaintiff to reemerge—i.e., that "the burden shifts back to the plaintiff to prove substantial similarity between any remaining (*i.e.,* unfiltered) protectable material and the allegedly infringing work."  959 F.3d at 1306.  The *Compulife* Court was therefore able to progress farther than this Court in the present case.  Since SAS failed to meet its burden of persuasion to combat WPL's allegations of unprotectability, this Court never reaches substantial similarity.

Appx17

unreliable.  Specifically, at a minimum, Dr. Storer's failure to filter out unprotectable elements resulted in an improper comparison of unprotectable elements to the accused products, rendering his opinions unreliable and unhelpful to the jury.  Fed. R. Evid. 702(a); *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993); *see also Gen. Universal Sys.*, 379 F.3d at 142 (explaining that a plaintiff demonstrates actionable copying "by showing that the allegedly infringing work is substantially similar to **protectable** elements of the infringed work") (emphasis added).  This determination is reinforced and supported by the egregious conduct of Dr. Storer, as documented in Defendants' Corrected Motion to Exclude Testimony of Dr. James Storer on Issues Related to Copyright Infringement (Dkt. No. 275); Defendants' Motion to Strike SAS Institute Inc.'s Expert Dr. Storer for Violating Rule 26(a)(2)(B), Rule 37(a)(4), and Rule 37(b); and the Discovery Hotline Order (Dkt. No. 256).  Accordingly, the Court **GRANTS** the Motion to Exclude.[11]

## V.   CONCLUSION

In light of the foregoing, and having considered the evidence, the arguments of the parties, the related briefing, and the relevant authority, the Court is of the opinion that the copyright claims of SAS in the above-captioned case have not been shown to be copyrightable, and therefore should be and hereby are **DISMISSED WITH PREJUDICE**.  However, the preclusive effect of such dismissal is tailored to this case and the asserted works.  This dismissal precludes SAS Institute Inc. from asserting against World Programming Limited the non-literal elements of the SAS System Software.

The Parties are **ORDERED** to meet and confer and to file a Joint Status Report setting forth their views on the current status of this case in light of this ruling and identifying any

---

[11] As Dr. Storer was the only technical expert offered by SAS, his exclusion has the practical effect of leaving SAS without any supportable copyright claims.  This is true regardless of the copyrightability determination made *supra*.

15

remaining claims ripe for the currently-set January 4, 2021 trial.  Such Joint Status Report shall be filed on or before **ten (10) days** from the date of this Order.  In such Joint Status Report, the Parties are also to identify which, if any, previously asserted pretrial motions need to be renewed or supplemented and why.

       **So ORDERED and SIGNED this 26th day of October, 2020.**

                                 RODNEY  GILSTRAP
                                 UNITED STATES DISTRICT JUDGE

Appx19

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

SAS INSTITUTE INC.,

      Plaintiff,

    vs.

WORLD PROGRAMMING LIMITED et al.,

      Defendants.

Civil Action No. 2:18-CV-00295-JRG

**JOINT STIPULATION AND ORDER OF DISMISSAL AND BRIEFING SCHEDULE ON COSTS AND ATTORNEYS' FEES**

Before the Court is the parties' Joint Stipulation and Order of Dismissal and Briefing Schedule on Costs and Attorneys' Fees (the "Stipulation").  (Dkt. No. 473.)  After consideration, the Court **APPROVES AND ACKNOWLEDGES** the Stipulation.   Based thereon, it is **ORDERED** that:

1.     SAS Institute Inc. ("SAS") filed this case on July 18, 2018 alleging copyright and patent infringement against World Programming Ltd. ("WPL) and others.[1]   *See* Dkt. 1.  SAS alleged copyright infringement of its "SAS System" and "SAS Manuals."  *Id.* at Causes of Action

---

[1] SAS named the following additional defendants: MineQuest Business Analytics LLC; MineQuest LLC; Angoss Software Corporation; Luminex Software Inc.; YUM! Brands Inc.; Pizza Hut Inc.; Shaw Industries Group, Inc.; and Hitachi Vantara Corporation (collectively "Non-WPL Defendants").  Prior to the October 14, 2020 Copyrightability Hearing, all Non-WPL Defendants were dismissed from this case.  *See* Dkt. 35 (Dismissing Hitachi Vantara Corporation); Dkt. 69 (Dismissing Angoss Software Corporation); Dkt. 73 (Dismissing MineQuest Business Analytics LLC and MineQuest LLC); Dkt. 262 (Dismissing Shaw Industries Group, Inc., YUM! Brands Inc., and Pizza Hut Inc.); Dkt. 435 (Dismissing Luminex Software, Inc.).

Appx20

One through Four.  SAS alleged patent infringement of four patents, U.S Patent Nos. 6,920,458, 7,170,519, 7,477,686, 8,498,996.[2]  On September 30, 2019, WPL filed its Answer to SAS Institute Inc.'s Amended Complaint and First Amended Counterclaims.  *See* Dkt. 168.  WPL pleaded declaratory judgment counterclaims pertaining to SAS's copyright infringement allegations.  *See id.* at Ninth Counterclaim (Declaratory Relief Regarding Non-Infringement of Purported Copyright(s) in "SAS System"); Tenth Counterclaim (Declaratory Relief Regarding Non-Infringement of Purported Copyright(s) in "SAS Manuals"); Eleventh Counterclaim (Declaratory Relief Regarding No Copyright in "SAS Language"); Twelfth Counterclaim (Declaratory Relief Regarding No Copyright in the Functionality of SAS System).  WPL pleaded declaratory judgment counterclaims of non-infringement and invalidity as to the patents-in-suit.  *Id.* at Counterclaims One through Eight, and Counterclaim Eighteen.  WPL also pleaded counterclaims under Sherman Act §§ 1-2, Lanham Act § 43, Tortious Interference with Existing or Prospective Contractual Relations, and the North Carolina Deceptive Trade Practices Act.  *Id.* at 63-80 (the "Damages Counterclaims" or Counterclaims 13 through 17).

**SAS's Copyright Claims and the Court's Memorandum Opinion and Order**

2.    The Court conducted a Copyrightability Hearing on October 14, 2020.  The Court issued its Memorandum Opinion and Order on October 26, 2020.  Dkt. 465.  The Court dismissed with prejudice SAS's copyright claims. *Id.* at 1. The Court also granted Defendants' Corrected Motion to Exclude Testimony of Dr. James Storer on Issues Related to Copyright Infringement (Dkt. 275). *Id.* at 15.  The parties agree that all copyright claims by SAS against WPL in the SAS System and SAS Manuals were dismissed by the Court with prejudice.

---

[2] SAS originally asserted U.S. Patent Nos. 7,170,519, 7,477,686, and 8,498,996.  SAS added infringement allegations of U.S Patent No. 6,920,458 in its August 2, 2019 Amended Complaint.  *See* Dkt. 128.

Appx21

3.      With all claims of copyright infringement by SAS against WPL dismissed with prejudice, the parties agree that WPL's counterclaims of copyright non-infringement and non-copyrightability are moot. Accordingly, WPL's counterclaims of copyright non-infringement and non-copyrightability are **DISMISSED AS MOOT**.

<div align="center">

**SAS's Patent Claims**

</div>

4.      Prior to the Copyrightability Hearing, SAS agreed to withdraw its infringement allegations for all four Patents-in-Suit.

5.      WPL maintains counterclaims seeking declaratory judgment of non-infringement and invalidity as to the Patents-in-Suit. However, the parties stipulate that SAS's infringement allegations for the Patents-in-Suit are dismissed with prejudice. Accordingly, SAS's infringement allegations for the Patents-in-Suit are **DISMISSED WITH PREJUDICE** and WPL's counterclaims of non-infringement and invalidity as to the Patents-in-Suit are **DISMISSED AS MOOT**.

<div align="center">

**WPL's Damages Counterclaims (Counterclaims 13 through 17)**

</div>

6. In Counterclaims 13 through 17, WPL pleaded counterclaims under Sherman Act §§ 1-2, Lanham Act § 43, Tortious Interference with Existing or Prospective Contractual Relations, and the North Carolina Deceptive Trade Practices Act. SAS previously moved to dismiss, and then moved for summary judgment against WPL's counterclaims under Rule 56. *See* Dkt. 162, 263. The Court denied as moot SAS's motion to dismiss and motion for summary judgment without prejudice to refile. *See* Dkt. 436.

7. In order to obviate the need for trial at this time and to proceed to WPL's request for costs, including attorneys' fees (*see* below), as well as to secure a final judgment that SAS intends to appeal, the parties expressly stipulate and agree as follows:

<div align="center">

3

</div>

<div align="center">

Appx22

</div>

a. The parties stipulate and agree to the dismissal without prejudice of WPL's Damages Counterclaims (Counterclaims 13 through 17).

b. The parties agree that the applicable statutes of limitations for the Damages Counterclaims will be tolled from the date of filing of the First Amended Counterclaims through the date the mandate issues from the appellate court in SAS's appeal of the final judgment dismissing SAS's copyright claims in this case (the "Mandate Issuance Date").

c. If the dismissal of SAS's copyright claims is affirmed on appeal in all respects and SAS has not brought another suit against WPL in the interim, then WPL agrees to a full release of SAS with the same scope and preclusive effect as if the Damages Counterclaims had been dismissed by this Court with prejudice.  For the avoidance of doubt, "another suit" does not include any steps taken by SAS to enforce the judgments against WPL in *SAS Institute Inc. v. World Programming Ltd.*, E.D.N.C. No. 5:10-cv-00025-FL (specifically including, but not limited to, any steps taken by SAS to enforce its judgment in the Eastern District of North Carolina or the Central District of California, or any steps taken by SAS to enforce its judgment in the Eastern District of Texas or to seek an offset of any costs or attorneys' fees awarded to WPL).[3,4] If SAS does file another suit against WPL in the period between any judgment in this case and the Mandate Issuance Date, this dismissal of the counterclaims will remain 'without prejudice' in all respects.  The parties agree that the effect of this with prejudice

---

[3] SAS expressly reserves the right to setoff any costs and/or attorney's fees awarded by the Court in this action to WPL against the judgment in *SAS Institute Inc. v. World Programming Ltd.*, E.D.N.C. No. 5:10-cv-00025-FL, which has been registered in this district.

[4] WPL does not agree that SAS should be entitled to any form of setoff resulting from costs and/or attorney's fees awarded by the Court in this action.

Appx23

dismissal is only to the claims as pleaded in WPL's First Amended Counterclaims and does not apply to future conduct.

d.    If the dismissal of SAS's copyright claims is not affirmed in all respects, then:

i.  WPL may refile the Damages Counterclaims (without substantive revision) in the U.S. District Court for the Eastern District of Texas within 30 days of the Mandate Issuance Date.

ii.  If WPL does not refile the Damages Counterclaims within this 30-day period, then WPL agrees to the same release set forth in paragraph 7(c) above.

ii.  If WPL does refile the Damages Counterclaims within this 30-day period, the parties agree to the following (with respect to the Damages Counterclaims only):

A)  The parties will file a joint motion to consolidate the Damages Counterclaims with this case and any copyright claims on remand.

B)  The parties will file a joint motion for a protective order in the same form as the protective order entered in this case at Dkt. 93.

C)  The parties will rely on the discovery and disclosures produced in this case and will take no further fact discovery.

D)  The parties will rely on the expert reports served in this case and will take no further expert discovery.  No further expert reports may be served by either side.

E)  The parties agree to file a joint motion for the case to proceed immediately to summary judgment and pretrial motions with the parties able to file any appropriate summary judgment motions, motions to exclude experts, or other pretrial motions in accordance with the Rules.

Appx24

8.  In accordance with the parties' agreement and stipulation, WPL's Damages Counterclaims (Counterclaims 13 through 17) are **DISMISSED WITHOUT PREJUDICE**.

9.  The Court expressly incorporates the terms of the parties' agreement herein and retains jurisdiction to enforce the parties' agreement.

10.  The parties' Joint Motion to Modify the Final Pretrial Order (Dkt. 470) is **DENIED AS MOOT**.

### Finality

11.  All claims against all parties have been disposed of as indicated herein and there are no remaining claims that are ripe for trial.  Accordingly, this is a final and appealable order. To avoid any issue regarding finality or the appealability of the Court's Memorandum Opinion and Order on October 26, 2020 (Dkt. 465), however, the Court expressly finds there is no just reason to delay entry of final judgment with respect to SAS's copyright claims against WPL or to delay any appeal of the October 26, 2020 Order.  Accordingly, the Court specifically directs entry of final judgment, in accordance with its October 26, 2020 Order, with respect to SAS's copyright claims against WPL under Federal Rule of Civil Procedure 54(b).  Pursuant to Federal Rule of Civil Procedure 54(d), Local Rule CV-54, and 28 U.S.C. § 1920, Defendant WPL is the prevailing party on SAS's copyright claims and its costs under 28 U.S.C. § 1920 shall be taxed against SAS on those claims. **WPL's Request for Additional Costs and Attorneys' Fees**

12.  The Court understands that WPL intends to file a post-judgment Motion for Costs, including attorneys' fees, pursuant to 17 U.S.C. § 505 and 35 U.S.C. § 285.  The Court hereby enters the following briefing schedule for that Motion, which will proceed in accordance with Federal Rule of Civil Procedure 54(d) and the Local Rules of this Court:

Appx25

| Opening (25 pages) | December 18, 2020 |
|---|---|
| Response (25 pages) | January 12, 2021 |
| Reply (7 pages) | January 20, 2021 |
| Surreply (7 pages) | January 27, 2021 |

**So ORDERED and SIGNED this 10th day of December, 2020.**


_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE


**SO STIPULATED**:

For Plaintiff SAS Institute,Inc.

Dated: December 10, 2020          **BY**:


_/s/ Pressly M. Millen_____
**WOMBLE BOND DICKINSON (US) LLP**

Pressly M. Millen (*admitted pro hac vice*)
Raymond M. Bennett (*admitted pro hac vice*)
WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone: 919-755-2135
Press.Millen@wbd-us.com
Telephone: 919.755.2158
Ray.Bennett@wbd-us.com

Christian E. Mammen (*admitted pro hac vice*)
Carrie Richey
WOMBLE BOND DICKINSON (US) LLP
1841 Page Mill Road, Suite 200
Palo Alto, CA 94304
Telephone: (408) 341-3067
Chris.Mammen@wbd-us.com
Telephone: (408) 341-3060
Carrie.Richey@wbd-us.com

Appx26

Samuel B. Hartzell
WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
919-755-2112
Fax: 919-755-6772
Sam.Hartzell@wbd-us.com

Michael C. Smith
Texas Bar No. 18650410
SIEBMAN, FORREST, BURG & SMITH, LLP
113 E. Austin Street
Marshall, Texas 75670
Tel: (903) 938-8900
michaelsmith@siebman.com

For Defendant World Programming Limited:

Dated: December 10, 2020                    **BY**:


*/s/ Bradley W. Caldwell*
**CALDWELL CASSADY CURRY P.C**

Bradley W. Caldwell
Texas Bar No. 24040630
Email: bcaldwell@caldwellcc.com
John Austin Curry
Texas Bar No. 24059636
Email: acurry@caldwellcc.com
John F. Summers
Texas State Bar No. 24079417
Email: jsummers@caldwellcc.com
Warren J. McCarty, III
Texas State Bar No. 24107857
Email: wmccarty@caldwellcc.com
CALDWELL CASSADY CURRY P.C.
2121 N. Pearl St., Suite 1200
Dallas, Texas 75201
Telephone: (214) 888-4848
Facsimile: (214) 888-4849

***Attorneys for Defendant World Programming***

Appx27

Charles Everingham IV
State Bar No. 00787447
ce@wsfirm.com
T. John "Johnny" Ward Jr.
Texas Bar No. 00794818
jw@wsfirm.com
Claire Henry
Texas Bar No. 24053063
claire@wsfirm.com
Andrea L. Fair
Texas Bar No. 24078488
andrea@wsfirm.com
WARD, SMITH & HILL, PLLC
P.O. Box 1231
Longview, TX 75606
903-757-6400
903-757-2323 (Facsimile)

***Attorneys for Defendant World Programming***

Appx28

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I caused the foregoing to be electronically filed with the Clerk of the Court using the appellate CM/ECF system on May 14, 2021, which automatically will send email notification of such filing to counsel of record.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Date: May 14, 2021

*/s/ Dale M. Cendali*
Dale M. Cendali
*Counsel for Plaintiff-Appellant*

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

Pursuant to Federal Rule of Appellate Procedure 32(g) and Federal Circuit Rule 32(b)(3), I certify that this brief complies with the type-volume limitations of Federal Circuit Rule 32(b)(1).  The brief has been prepared using a 14-point, proportionally-spaced typeface and includes 13,999 words, based on the "Word Count" feature of Microsoft Word 2016, including footnotes and endnotes.  This word count does not include the words contained in the items identified as excluded by Federal Rule of Appellate Procedure 32(f) or Federal Circuit Rule 32(b)(2).

Date: May 14, 2021

*/s/ Dale M. Cendali*
Dale M. Cendali
*Counsel for Plaintiff-Appellant*